[Philadelphia, February 21, 1834.]

## HELLMAN for the use of MILTENBERGER Trustee of HELLMAN *against* HELLMAN and Others.

### IN ERROR.

A release of a pecuniary legacy charged upon land, not executed before at least two competent subscribing witnesses, is not within the provisions of the act of fifteenth of *April* 1828 ; and therefore a certified copy of it from the recorder of the county, is not admissible in evidence under that act.

A release of such a legacy is not such a deed, conveyance or writing, as passes or creates any right or interest, in or to the land on which it is charged, and consequently is not embraced by any of the acts of assembly, provided for the recording of deeds and conveyances or other writings, made of and concerning lands lying within this state.

It *seems*, that under the act of the eighteenth of *March*, 1775, conveyances, although not under the hands and seals of the parties respectively executing the same, " of or concerning any lands, &c. or whereby the same may be in any way affected in law or equity," may be recorded, after having been proved or acknowledged in the manner prescribed by law, and exemplifications of them read in evidence.

The lien of a legacy charged upon land is discharged by a judicial sale of the land, though the legacy is payable by instalments, some of which are not due at the time of the sale.

Where a release of a legacy charged upon land has been given in evidence, the record of a judgment on a bond given by the devisee of the land to the legatee, which from the declaration appears to have been of the same date as the release, is competent evidence, in an action brought to recover the amount of the legacy, to show, not only the fact that the judgment was had, but also its amount, and the consideration or cause of action, for which it was rendered.

The sheriff has no right, power or authority to sell land subject to one lien and discharged from another, without the consent of all the parties concerned.

Where a legacy is charged upon land and payable by instalments, and the testator in a subsequent clause of his will, declares that it is his will and desire, that the legatee " shall receive no *principal*, but receive the *interest as it becomes due*," the whole legacy is vested and the legatee may release it to the devisee of the land.

(Hellman *v.* Hellman.)

On the return of a writ of error to the Court of Common Pleas of *Northampton* County, it appeared from the record, that this suit was brought by *John Hellman,* who sued for the use of his trustee, *Nicholas Miltenberger,* against *Abraham Hellman* and *Daniel Rohn,* executors of *Christian Hellman,* deceased, *Abraham Hellman,* devisee of the lands and tenements whereof the said *Christian Hellman* died seized in his demesne as of fee, and *J. C. Becker,* tenant of the said lands and tenements, to recover the amount of a legacy charged upon the testator's real estate in favour of the plaintiff.

By the will, which bore date the sixth of *April,* 1815, and was proved on the twelfth of the same month, the testator, after making some specific bequests of goods, &c. to his widow, directed as to her, " and further to receive during her life, out of the estate, the interest of three hundred pounds per annum, as long as she remains a widow; likewise to have privilege to remain in this house which I now occupy, during life; further, my son *Abraham* to haul wood, and cut it at the house, as much as she has need for."

The will then proceeded thus:

" And further, it is my will and bequest, that my son *Abraham* have the whole of my real estate, with the choice of two horses, one colt, wagon, plough, harrow, wind-mill, harness for three horses, one sleigh, one dung hook, two forks, one hay fork, out of which property the said *Abraham* to pay to my other children as follows, to wit: to my son *John,* my daughter *Catharine Rohn, Magdalene Rohn, Elizabeth Kressler* and *Rachel Miltenberger,* each and every of them as follows: —*Catharine,* wife of *Daniel Rohn,* one hundred dollars, one year after my death; *Magdalene,* wife of *Casper Rohn,* one (hundred) dollars two years after my death; *John Hellman,* one hundred dollars three years after (my) death; *Elizabeth Kressler* one hundred dollars four years after my death; *Rachel,* wife of *Nicholas Miltenberger,* five years, one hundred dollars; the above payments to be yearly paid till they amount to one thousand pounds, to be paid to the above mentioned legatees—three hundred pounds to be deducted at the death of my beloved wife. *It is further my will and desire that my son John receives no principal,* but receive the interest as it becomes due." &c.

It was conceded, that *Rosina Hellman,* the widow of the testator, died on the sixth of *September,* 1828.

After the plaintiff had given in evidence the record of the Court of Common Pleas of *Northampton* County, from which it appeared that on the twenty-first of *November,* 1829, on the petition of *John Hellman,* the court appointed *Nicholas Miltenberger* his trustee, his counsel stated his claims to be for one hundred dollars, due the sixth of *April,* 1818, one hundred dollars due the sixth of *April,* 1823, one hundred dollars due the sixth of *April,* 1828, and one hundred and sixty dollars due the sixth of *September,* 1828, the time of the widow's death, with interest from the times those respective sums fell due, and rested his case.

(Hellman *v.* Hellman.)

The defence set up by *Becker*, the terre-tenant, was, that there was no legal plaintiff on the record, the Court of Common Pleas having no power to appoint a trustee in a case like this: That *John Hellman*, the legatee, had on the fifteenth of *May*, 1815, released all claim on the estate on account of his legacy, in consideration of the sum of three hundred and seventy-five pounds, acknowledged to have been paid, which release had been put on record, and was notice to all the world: That the sheriff had subsequently sold to the defendant *Becker*, the land devised to *Abraham Hellman* under execution against him by which the lien of the legacy was divested, and that one of the bonds given to *John Hellman* when the release was executed, was the foundation of a judgment to the payment of which part of the purchase money was applied.

In support of the defence thus set up, the defendant's counsel offered in evidence, an exemplified copy of a release from *John Hellman* to *Abraham Hellman* dated the fifteenth of *May*, 1815, to the admission of which the plaintiff's counsel objected, but the court overruled the objection, and their decision on this point was the subject of the first bill of exceptions.

The defendant then offered in evidence the record of a judgment in a suit brought by *Nicholas Miltenberger* against *Abraham Hellman*; the executions issued upon that judgment; the sale by the sheriff under those executions, and a deed from the sheriff to *J. C. Becker*, dated the twenty-fifth of *January*, 1823. This evidence was objected to by the plaintiff's counsel, because it was irrelevant to the issue trying, and did not divest the lien of the legacy.

The court however permitted the evidence to be given and a second bill of exceptions was tendered and sealed.

The subject of a third bill of exceptions was the rejection by the court of the record of a judgment in a suit brought to *April* Term, 1819, by *John Hellman* to the use of *Daniel Rohn* against *Abraham Hellman* on a bond for two hundred dollars, which appeared from the declaration to be of the same date as the release already referred to. It was objected to by the plaintiff's counsel as irrelevant to the issue, and inadmissible under the pleadings in the cause; but the court overruled the objection.

The defendant after having given other evidence which is not now material, examined several witnesses who proved that *John Hellman* had no property except what he got from his father's estate: That he was addicted to liquor, but was sometimes sober for a week or two, and that when sober he was capable of taking care of his affairs: That he was always fond of liquor, and was then more addicted to it than he used to be.

After the defendant had closed his evidence, the plaintiff gave in evidence three bonds, dated the fifteenth of *May*, 1815, from *Abraham Hellman* to *John Hellman* for the payment of fifty pounds, one of them payable the fifteenth of *April*, 1828, the second payable the fifteenth of *April*, 1829, and the third payable the fifteenth of *April*,

(Hellman *v.* Hellman.)

1830. He also gave in evidence the conditions of the sheriff's sale which took place on the fourth of *January*, 1823, at which *Becker* became the purchaser, which were as follows :

" First—The highest and best bidder shall be the buyer.

" Second—The purchase money shall be paid on or before the the third Monday of *January* instant, at which time a deed will be executed by the sheriff.

" Third—If the purchaser fail to pay the purchase money at the time above stated he shall be liable for any loss at a subsequent sale, and shall not be entitled to any advantage should an additional price be given at such subsequent sale for the said premises.

" Fourth—The purchase money shall be applied to the payment of liens by mortgage and judgment, according to priority."

When the evidence on both sides was closed, the plaintiff's counsel requested the court to charge the jury on the following points of law :

" 1. The legacy was a charge on the land, and the sheriff's sale under the conditions on which the property was sold, did not divest the lien.

" 2. That *John Hellman* was incompetent to release the legacy given by the will of *Christian Hellman,* deceased, more especially as *Abraham Hellman* was one of the executors, and bound to guard the interests of the legatees.

In answer to the first point proposed by the plaintiff's counsel, the court charged the jury, that " the sheriff's vendee took the land discharged of the lien of the legacy, unless it was sold subject to the lien ; and in the opinion of the court there is no exception as to this lien in the condition of sale."

In answer to the second point, the court charged the jury, that " *John Hellman* had a right to receive what his father had left to him, and he had a right to discharge his interest under the will in this case, if he was capable of managing his affairs."

To this opinion the counsel for the plaintiff excepted, and requested that it might be filed, which was done accordingly.

The errors assigned in this court were :

1. The admission in evidence of the copy of the record of the release, *John Hellman* to *Abraham Hellman,* dated the fifteenth of *May,* 1815.

2. The admission in evidence of the record of the suit, judgment, executions and sheriff's sale mentioned in the second bill of exceptions.

3. The admission in evidence of the record of the suit and judgment mentioned in the third bill of exceptions.

4. The court erred in their charge to the jury in not affirming the first point propounded, and in what was said in answer to said point.

5. The court erred in charging the jury in answer to the second point propounded, that *John Hellman* had a right to receive what his father had left him, and had a right to discharge his interest under the will in this case, if he was capable of managing his affairs.

6. That the court did not fully and distinctly answer the points propounded.

*J. M. Porter*, for the plaintiff in error, referred to the acts of the fifteenth of *April*, 1828, *Purd. Dig.* 207, of the twenty-eighth of *May*, 1715, *Purd. Dig.* 195; and of the eightcenth of *March*, 1775, *Purd. Dig.* 198. *Sharp* v. *Sharp*, 13 *Serg. & Rawle*, 444. *Barnet* v. *Washebaugh*, 16 *Serg. & Rawle*, 410. *M'Lanahan* v. *Wyant*, 1 *Penn. R.* 112. *Shultze* v. *Diehl*, 2 *Penn. R.* 277. *The Comm.* v. *Alexander*, 14 *Serg. & Rawle*, 257. *Fickes* v. *Ersick*, 2 *Rawle*, 166. *Ripple* v. *Ripple*, 1 *Rawle*, 386. *Duncan* v. *Reiffe*, 3 *Penn. R.* 368. *Anwerter* v. *Mathiot*, 9 *Serg. & Rawle*, 397. *Weidler* v. *The Farmer's Bank of Lancaster*, 11 *Serg. & Rawle*, 134. *Roper on Leg. Ch.* 21, sec. 313, page 311. *Pidcock* v. *Bye*, 3 *Rawle*, 183. *Sparks* v. *Guarrigues*, 1 *Binn.* 152.

*Jones*, for the defendant in error, cited *Thomas* v. *Thomas*, 1 *Rawle*, 120, 121. 1 *Roper on Leg.* 340. 343, 344. Act of the twenty-second of *March*, 1825, *Purd. Dig.* 858. Act of the fourteenth of *April*, 1828, *Purd. Dig.* 859. *Kelly* v. *Dunlap*, 3 *Penn. R.* 137. *Lapatee* v. *Pecholier*, 2 *Wash. C. C. R.* 180. *Whart. Dig.* 597.

The opinion of the Court was delivered by

KENNEDY J.—The first error in this case is an exception to the opinion of the court in which it was tried, admitting the defendants to read in evidence to the jury a certified copy from the recorder of the county, of a release purporting to have been executed and given by *John Hellman*, the plaintiff, to *Abraham Hellman*, one of the defendants, for the legacy, to recover a part of which this suit was brought.

The release of which the certified copy was given in evidence, appearing from the face of the copy not to " have been executed before at least two competent subscribing witnesses," is clearly not within the provisions of the act of assembly of the fifteenth of *April*, 1828, and therefore the certified copy of it from the recorder of the county was not admissible in evidence under that act. But it has been contended that it is embraced by the previous acts of assembly, providing for the recording of deeds and conveyances, or writings made of and concerning lands lying within the state. The act of 1715, which is the first on the subject, declares that " all bargains and sales, deeds and conveyances of lands, tenements and hereditaments, in this province may be recorded," &c. after having been acknowledged or proved in the manner therein prescribed. The act of 1775, directs the recording of " all *deeds* and *conveyances*, which from and after the publication thereof shall be made and executed within this province of or *concerning any lands*, tenements or hereditaments in this province, or whereby the *same* may be any way *affected in law* or *equity*." And by the sixth section of this act, the recorder is directed to make an entry in a book which he is required to keep for that purpose, "of every deed or *writing* brought into his office to be

(Hellman *v.* Hellman.)

recorded," showing here by the use of the term " writing," as I apprehend, that it was not intended to confine or restrict the meaning of the term " conveyances" used in the first section, which I have recited in part, to *deeds*, so that conveyances, although not made under the hands and seals of the parties respectively executing the same, " of or concerning any lands, &c. or whereby the same may be any way affected in law or equity," may be recorded after having been proved or acknowledged in the manner prescribed by any of the various acts providing therefor, and copies thereof certified under the seal of the recorder's office, according to the fifth section of the act of 1715, " shall be allowed in all courts where produced, and are thereby declared and enacted to be as good evidence, and as valid and effectual in law as the original," &c.   Besides it is the more reasonable to give this construction to this act, making it embrace writings not under seal as well as those that are ; for only three years before the legislature passed the act against frauds and perjuries, which makes a writing signed by the party though not under his seal, sufficient to pass his interest in lands.   From these acts of the legislature taken collectively, I think it is pretty evident that the " deeds and conveyances, or writings" therein mentioned and authorised to be recorded, must be understood to mean such as pass or create an interest or right of some kind in land, unless indeed it be mortgages, which are expressly mentioned in other parts of the act of 1715. But a release or an assignment of a mortgage I do not consider as embraced.   This presents then the question, is a release of a pecuniary legacy charged upon land, such a deed, conveyance or writing as passes or creates any right or interest in or to the land upon which it is charged ? It does not consist of land, nor call for it ; it is a certain amount of money, and cannot without consent or agreement be paid or satisfied in any thing but money.   It is to be sure charged upon land in this case, which was devised by the testator to *Abraham Hellman*, one of the defendants, whom he directed to pay the legacy in question.   It is therefore only at most a lien upon the lands.   Now a lien even upon personal property is said to be neither a *jus ad rem* nor *jus in re* although it gives the party a right of retaining the goods until his demand shall be paid.   *Meany* v. *Head*, 1 *Mason's Cir. Court Rep*. 319.   If this proposition be true in respect to goods, as no doubt it is, its truth as to lands is still much more apparent, where it does not even give a right to hold or retain the possession of them. No one ever supposed that the release of a judgment which was a lien upon the land of the releasee, or that the receipt of the plaintiff therein given to the defendant for the payment of it came within either the letter or meaning of our recording acts ; yet the legatee has no more right to, or interest in the land upon which his legacy is charged, than the plaintiff in the judgment has to or in the lands of the defendant bound by it.   And that such had ever been the universal understanding of the meaning of the recording acts until the fifteenth of *April*, 1828, when the legislature passed the act already

mentioned, is shown very clearly by the terms of it.   This act directs that " any release or other instrument in writing being evidence of the payment or satisfaction of any *legacy charged upon lands*, tenements or hereditaments, and also any release or other instrument in writing, given to any executor, administrator, assignee, trustee or guardian, whether relating to real or personal estate, if such release or other instrument in writing, shall be under *seal*, and shall have been executed before at least *two competent subscribing witnesses*, and shall also have been acknowledged, or the execution thereof proved, in the manner provided by the existing laws for the acknowledgment or proof of the execution of deeds and conveyances of lands, tenements and hereditaments, in order to authorize the same to be recorded, *may in case such release or other instrument in writing, relates to real estate, be recorded in the office for recording of deeds in the county where such real estate may be situate*, &c. and *copies* or exemplifications of such releases or other instruments in writing under seal, acknowledged or proved and recorded as aforesaid, being examined by the recorder, and certified under the seal of the proper office, which the recorder or keeper thereof is thereby required to do, shall be *allowed* as well in all *courts* where produced as *elsewhere*, and are thereby declared and enacted to be as *good evidence*, and as valid and effectual in law as the *original releases*, or *other instruments in writing under seal* would be, if duly *proved* by the *subscribing witnesses* thereto, and the same may be shown, pleaded and made use of accordingly."   The passage of this act so far as it relates to the releases of legacies charged upon lands, would have been unnecessary had they been included in the recording acts passed previously; and had it been then understood that they were embraced, they would no doubt have been omitted.   Seeing that the copy of the release given in evidence in this case, is not embraced and provided for by any of our recording acts, it is manifest that it was not admissible in evidence upon any principle of the common law. The court were therefore wrong in receiving it.

The second error is an exception to the opinion of the court, in admitting to be read in evidence the record of a judgment and the proceedings thereon at the suit of *Nicholas Miltenberger* against *Abraham Hellman*, one of the defendants in this case, and the devisee of the land charged with the legacy in question, showing that the land had been taken in execution and sold as his property by the sheriff, in the month of *January*, 1823.

That this judgment, and the proceedings under it, including the sheriff's sale of the land charged with the payment of the legacy in this case, were admissible and competent evidence, cannot, according to the doctrine laid down and established by this court in *Barnet* v. *Washebaugh*, 16 Serg. & Rawle, 410, and *McLanahan* v. *Wyant*, 1 *Penn. Rep.* 95, be doubted; and ought not now to be questioned.   It was evidence of the highest character to show that there had been a judicial sale of the land, and therefore not liable to the objection that

it was not the best evidence that the nature of the thing admitted of;
and in the next place, according to the cases cited, went to show that
the land was thereby discharged of the legacy, and therefore not liable
for the payment of it in the hands of *J. C. Becker,* one of the defend-
ants in this case and the purchaser at the sheriff's sale; which proves
the pertinency and the important bearing of it upon the issue as re-
spected *Becker.* It is said that the legacy in this case had not become
payable at the time the land was sold by the sheriff, and therefore it was
unlike to the cases cited.   One hundred dollars however of it, accord-
ing to the plaintiff's own statement of the case, had become so, and
another hundred dollars within a few days of it, so that as to one
hundred dollars of the plaintiff's claim, there is not even the shadow
of a difference, which is sufficient to make the evidence competent
and admissible.   But it appears to me, that the whole of the legacy
charged upon the land in this case, falls within the principle decided
in the cases of *Barnet* v. *Washebaugh,* and *M'Lanahan* v. *Wyant.*
By the terms of the will, I consider it in effect a bequest of two hun-
dred pounds to *John Hellman,* to be paid to him by *Abraham Hellman,*
the devisee in fee of the land, in instalments of one hundred dollars
each; the first instalment to be paid in three years after the death
of the testator, and the like sum of one hundred dollars every five
years thereafter, until the whole of the two hundred pounds should
be paid.   It is not like the case of an annuity, or rent charged upon
land during the life of the party, or for any other indefinite period,
which has been spoken of, and about which I give no opinion.   The
amount of the bequest in this case is certain, and the times of pay-
ment became fixed immediately upon the death of the testator.   The
amount or value of the legacy was therefore capable of being reduced
to a sum certain at any intermediate time before it became payable,
that a judicial sale might happen to be made of the land.   It is evi-
dent from the face of the will, that the remoteness of the times fixed
thereby for the payment of the legacy, was done for the accommoda-
tion and benefit of the devisee of the land, who was to pay it; and
that it was made a charge upon the land, for the better security and
advantage of the legatee.   I can perceive no essential difference be-
tween the legacy charged in this case upon the land, and the case of
a judgment bond, had it been given by *Abraham Hellman* and been
entered up against him, so as to become a lien upon his land, by which
he had bound himself to pay to *John Hellman* one hundred dollars on
the first of *April,* 1818, and the further sum of one hundred dollars
every five years thereafter, until the full sum of two hundred pounds
should be paid.   This latter case must have occurred frequently in
principle, and, as I apprehend, in no case of the kind has it ever been
determined that the lien of the judgment was not discharged by the
judicial sale of the land, although made before the money became
payable upon the judgment.   Wherever the real amount or value of
the lien or charge upon the land is capable of being reduced at any
time to a sum certain in money by mere calculation, and is of a pecu-

niary character, I can perceive no sufficient reason for distinguishing it from the case where it is a sum certain and payable at or before the time of sale. If it were to be held that lands about to be sold under judicial process, must be sold subject to all liens upon them which have not become payable at or before the sale, it would not only be attended with great inconvenience, but would very much depress the prices that will be given on such sales, which everybody knows will continue to be sufficiently low at the best. If such a doctrine were to be established, a lien having only a single day to run at the time of the sale, would not be discharged by it; for there is no principle by which we can distinguish between a day and a year, or between one and ten years, in such cases.

The third error is, an exception to the opinion of the court in admitting to be read in evidence the record of a judgment obtained against *Abraham Hellman*, for two hundred dollars, upon a bond in favour of *John Hellman*, bearing even date, as appeared from a recital of it in the declaration, with the date of the release, as appeared from the copy thereof given in evidence. If the original release itself had been produced and given in evidence, after having given evidence of its execution, the record of this judgment might, perhaps, have had some bearing upon the cause, in order to support the release, by showing the consideration given for it, as it appeared to be a transaction of the same date. Judgment having been rendered, I think the record of it was not only evidence of the fact that the judgment was had, but also of its amount, and of the consideration or cause of action for which it had been rendered, which, as appeared from the declaration which formed a part of the record of the judgment, was a bond. I am therefore not prepared to say, that there was any error in admitting this judgment to be read in evidence to the jury, had the original release been properly given in evidence.

The fourth error is an exception to the answer of the court to the first point submitted by the plaintiff's counsel, upon which the court was requested to instruct the jury, " that the legacy was a charge upon the land, and that the sheriff's sale, under the conditions on which it was sold, did not divest the lien." In reply to this the court told the jury, " that the sheriff's vendee took the land discharged of the lien of the legacy, unless it was sold subject to the lien; and in the opinion of the court there was no exception as to this lien in the conditions of sale." That the court below was right in directing the jury that the sheriff's sale of the land discharged it from the lien of the legacy has been already shown in what I have said upon the second error; and as to the conditions upon which sheriffs shall make judicial sales of land, I will merely observe, that so far as the rights and interests of the parties concerned therein are connected with the terms and conditions upon which such sales are to be made, and may be affected by them, the law has prescribed the terms and conditions, and it is not in the power of the sheriff, without the consent of all the parties concerned, to alter or change them, to the prejudice of any. The

(Hellman *v.* Hellman.)

sheriff of himself has no power or authority to say that the land shall be sold subject to one lien and discharged from another. The rights and preferences of the lien-creditors are all established by law, and each has a right to require payment of his demand from the sheriff, out of the money arising from the sale according to the seniority of his liens. In what I have just said, I do not include mortgage-creditors who are placed on a footing peculiar to themselves by a late act of assembly.

The fifth error, which is the only remaining one that has been insisted on, is an exception to the charge of the court to the jury, on the second point submitted by the plaintiff's counsel; which was, to charge the jury, " that *John Hellman* was incompetent to release the legacy given by the will of *Christian Hellman,* deceased, more especially as *Abraham Hellman* was one of the executors, and bound to guard the interests of the legatees." To this the court answered, " that *John Hellman* had a right to receive what his father had left to him, and he had a right to discharge his interest under the will in this case, if he was capable of managing his affairs."

From the terms in which this second point is drawn up by the plaintiff's counsel, it seems to me that the only question involved in it, was one of fact, proper to be left to the jury to be decided by them, that is, whether *John Hellman* possessed sufficient strength and soundness of mind to enable him to release his right to the legacy; and that the court below might have contented themselves in their answer, with leaving it as such to be settled by the jury. It is probable, however, that the discussion before the court and jury in regard to this point, took a much wider range than is expressed in it as reduced to writing, for the court in their answer speak of the nature of the legacy, and say that *John* had a right to receive it, and could therefore release it, if capable of managing his affairs. And in the argument before us, the character of the legacy has been introduced and objections made to *John's* being able to release it on account of its peculiar nature.

If the legacy be vested as the court below, from their answer must have considered it, then these objections are clearly groundless. That it is vested, and was so intended by the testator, is sufficiently manifest from the terms and whole tenor of the will itself. It appears from the will, that the testator had six children, who are all mentioned by name in it. To his son *Abraham* he gives certain specific articles of his personal estate, and the whole of his real estate, out of which he directs *Abraham* to pay one thousand pounds, to his other five children, *John* (the plaintiff), *Catharine, Magdalene, Elizabeth* and *Rachel,* in the following manner : " to *Catharine* one hundred dollars one year after my death ; to *Magdalene* one hundred dollars two years after my death; to *John* (the plaintiff) one hundred dollars three years after my death ; to *Elizabeth* one hundred dollars four years after my death ; to *Rachel* one hundred dollars five years after my death ; the above payments to be yearly paid till they amount to

one thousand pounds, to be paid the above legatees." And in a subsequent independent clause, the testator adds, " It is further my will and desire, that my *son John* (the plaintiff) receive *no principal*, but *receive the interest as it becomes due.*" To *Abraham* it is a specific bequest of certain articles of the testator's personal estate, and a devise of the whole of his real estate, *minus* one thousand pounds; and to his other five children it is in effect a pecuniary bequest of two hundred pounds to each of them, to be paid by *Abraham* in instalments of one hundred dollars each, commencing with the payments thereof at the times respectively appointed for the payment of the first hundred dollars to each respectively, and to be followed by a payment of one hundred dollars to him or her every five years thereafter, until each shall have received his or her two hundred pounds. And the subsequent clause in the will, expressing the will and desire of the testator that *John* should receive *no principal*, but the *interest* as it became due, is not to be construed as curtailing or lessening in amount the legacy previously given to *John*, putting him barely upon an equal footing with his sisters, but as cautionary and directory to *Abraham*, the devisee, to withhold payment of the principal, under circumstances that would be likely to make it of no benefit to *John* to receive it. The plain intent of the testator appears to have been, that *Abraham* should pay one thousand pounds to his other children, and that each of the latter should receive equal portions of it. Why should we nullify the express previous bequest of the *principal* to *John*, by the subsequent clause? For if the testator had not intended that *John* should have the benefit of the two hundred pounds for himself and his children, as well as each of the daughters, why has he expressly declared that he should, and pointed out so expressly the different periods at which it should be paid? I do not consider the subsequent clause so completely incompatible with the payment of the principal to *John*, and his representatives, as to overthrow it, for, generally, where the *interest* of a legacy is given to or in trust for the legatee, without any qualification, the *principal* will be considered as bequeathed also. 2 *Roper on Leg.* 331. In the case of a devise of realty, words of limitation must be added to give more than an estate for life; but in the case of personalty, words of qualification are required to restrain the extent and duration of the interest. *Prima facie*, a gift of the *produce* of a fund, is a gift of that *produce* in *perpetuity;* and is consequently a gift of the *fund itself*, unless there is something upon the face of the will, to show that such was not the intention. *Adamson* v. *Armitage*, 19 *Ves.* 416. Now even according to this rule, the payment of the *interest* to *John* not being restrained to any particular duration of time by the subsequent clause, amounts to a gift of it in perpetuity, which carries with it a gift of the *principal* itself. I cannot perceive the slightest indication of intention on the part of the testator, from his will, that *Abraham* should have the principal at *John's* death, which would be the inevitable consequence if it be not given by the will to *John*.

(Hellman *v.* Hellman.)

It however has been contended, that inasmuch as the legacy here is charged upon land, until the time appointed for the payment of it by the will had arrived, and the legatee was found to be then living, it was not vested but contingent, and uncertain whether it ever would become payable: for if *John*, the legatee, had died before 1818, the time fixed for the payment of the first hundred dollars of the legacy, the whole of it would have sunk into the land or real estate devised to *Abraham* for his benefit, and the representatives of *John* would never have become entitled to receive any part of it; and therefore, at most, it could be released no further by *John* than it had become payable at the time of giving the release; and as the release alleged to have been given by him appears to have been made in *May* 1815, and as no part of the legacy became payable till *April*, 1818, it is no bar to the plaintiff's recovery. It is true, that a distinction has prevailed between a legacy bequeathed to a legatee that is to be paid out of the personal estate, and one that is charged upon and to be paid out of the real estate, at a future day, to which the payment in either appears to have been postponed on account of the age of the legatee. The first has been held vested, in conformity to the rule of the civil law, which was adopted by the ecclesiastical courts, where cognizance was first taken of testamentary matters, and for sake of uniformity observed by courts of equity when they came to exercise a concurrent jurisdiction afterwards. 1 *Roper on Leg.* 376. But the second case never having fallen within ecclesiastical jurisdiction as it concerned the real estate, has been considered conditional or contingent, according to what was deemed to be the rule of the common law. 1 *Roper on Leg.* 432, *et seq.* If, however, the payment of the legacy charged upon real estate is not postponed on account of the age of the legatee or child, but in regard to the *convenience* of the *person* or circumstances of the estate *charged* with it, the legacy will be considered *vested* and not conditional. 1 *Roper on Leg.* 436, *et seq.* Now it is impossible to avoid seeing, that the payment of the legacy in question was postponed exclusively for the convenience and advantage of *Abraham*, the devisee of the land, who is charged with the payment of it, which gives to it the character of a vested legacy; so that it never can sink into the land, but must be paid, in any event, either to the legatee himself, or to his assignees or representatives in case of his dying before the time appointed for payment. What then was there to prevent his releasing it at any time, if he were of sound mind and discretion? It would scarcely seem to comport with free agency, to force a benefit upon a party against his will. There may be vested rights so completely *personal* as not to be assignable either in law or equity, but still they may be released. Indeed, I apprehend there are few if any vested rights that cannot be released by the person entitled to them.

The circumstance of the release having been given to *Abraham Hellman*, who by the will would seem to have been vested with the exercise of some discretion in regard to paying the principal of the

(Hellman *v.* Hellman.)

legacy to *John*, but as he might seem to require it, is not of itself suf-
ficient to set aside the release and render it inoperative, though it
may be a reason why the jury should be satisfied that it was fairly
obtained. *Abraham Hellman* was at liberty to pay to *John* the prin-
cipal as well as the interest of his legacy as it became payable; or
before, if he chose, because it was clearly to favour him that the time
of payment was postponed.

I have left out of view all that is said in the will of the three hun-
dred pounds, the interest of which is directed to be paid by *Abraham*
to the widow during her widowhood; and have declined to consider
it as a part of the one thousand pounds ordered to be paid to the five
children; because if such were the intention of the testator, it is not
expressed with sufficient clearness to afford any certainty of it; and
ought not therefore to be permitted, upon mere conjecture, to inter-
fere with and to change what is clearly expressed.

The judgment is reversed for the first error assigned, and a
*venire facias de novo* awarded.