*Twenty-first Judicial District.*

# In the Court of Common Pleas of Schuylkill County.

## (*In Equity.*)

## THE PHILADELPHIA & READING COAL & IRON COMPANY *v.* ROBERT TAYLOR, *et al.*

Where there are two mining operations—one owner working on the upper level, and one on the lower level of the same vein—the owner of the upper level, operating in the most approved method and with care, is not required to control the natural flow of the water downwards, and may work his coal out down to his line, and the maxim of the common law *sic utere tuo ut alienum non laedas* applies.

And the owner of the subjacent level owes a servitude, and must leave a pillar of coal to support the gangway and keep out the water from the level above.

Adjoining owners on the same level of the same vein, owe no special duty to each other.

When, however, the owner of the superjacent land has created a servitude upon his land, in favor of the subjacent owner, such as a right to drive an air-way through his works and to connect with the surface, such owner after he has worked all his coal out and is about to abandon his workings, must give *reasonable* notice of this to the owner of the dominent tenement, and on failure so to do, equity will restrain him from permitting the water to fill up, if by so doing it will destroy the easement, the owner of the dominent tenement to be at the expense of pumping the water until the injury can be remedied. Reasonable notice is relative and depends upon the work to be performed.

A party having an easement on the land of another, may go upon the land for the purpose of the enjoyment of such easement to its fullest extent, either to construct or repair—or secure it from danger—doing as little damage as possible and responsible for that damage—for the grant of a privilege carries with it every thing necessary to its enjoyment.

Injunction.

Opinion delivered October 27, 1873, by

WALKER, J. This bill in equity was presented at chambers on 1st October, 1873, and a special injunction was asked for, preliminary until hearing, and thereafter to restrain the defendants from permitting their old workings on Little Mine Run colliery to fill with water, until the plaintiffs can procure machinery of sufficient capacity to pump the same out of their own slope at the Bast Colliery.

The preleminary injunction was granted and the hearing fixed on October 7, 1873, at which time it was ably argued by counsel.

The injunction is asked to prevent the defendants from allowing their old workings to fill up with water.

The reasons assigned for this writ are:

1. That the plaintiffs' operation at the Bast Colliery will be irreparably injured, and the lives of their men endangered, if the defendants be allowed to flood their old workings with water, and

2. That they will be deprived of the right and privilege of completing their air-way, and their purchase of that right will be rendered valueless and useless.

In the first place I am asked, on account of the great and irreparable

injury to the plaintiffs' operation and danger to their workmen, to restrain the defendants from allowing their mines to fill with water, or to permit the plaintiffs to come upon their land and pump out the water.

Before this can be done, the plaintiffs must establish some right upon which to found equitable interposition. If they have no such right they are entitled to no remedy, though they may suffer irreparable injury. Chadwick, *v.* Trower, 6 Bing. N. C. 256; 37 Eng. Com. Law, 255. It is not alleged that the defendants in the working of their operations have been guilty of any trespass, or that they have heretofore done any matter or thing inconsistent with the most approved method of mining.

Have the plaintiffs then a legal right to require the defendants to keep the water out of their levels, in order that they may enjoy and use their own works in the level below? In determining this it will be necessary to consider the relative rights of owners of upper and lower levels, and of adjoining lands to each other under the present system of mining coal.

It often happens that there are two estates in the same land, the surface right and the underground right. One owns the surface and another the minerals below the surface. These estates are well defined and are consistent with each other. (Caldwell *v.* Fulton, 7 Casey 483.)

The owner of the surface, if not restricted by his deed, has a perfect right to erect his buildings and make his improvements on any portion of his land, even upon the crop of a coal vein belonging to another person, and which ultimately will be worked.

The owner of the coal has a servient right, and is bound in working it to leave a pillar to support the surface. Baron Parke in Harris *v.* Ryding. 5 Meeson & Welsby, Exch. 60 remarks: "I do not mean to say that all the coal does not belong to the defendants, *but they cannot get it out without leaving proper supports.*" See also The Earl of Glasgow *v.* The Alum Co. 8 Eng. Law and Eq. 13.

The upper and underground estates being several, they are governed by the same maxim which limits the use of property otherwise situated. *"Sic utere tuo ut alienum non laedas."* Jones *v.* Wagner 16, P. F. S 429. per Thompson, C. J.

The same doctrine obtains in the working of upper and lower levels on the same vein.

There are certain rights well known and recognized, as to the flow of water upon the surface of the ground. *Aqua currit et debet currere* is the common law maxim of water courses. The distinction between subtaranean and surface rights, is ably discussed in Acton *v.* Blundell, 12, Meeson & Welsby 324, by Tendall, C. J., and seems to be, that as to the surface flows, parties acquire rights to them, because everybody who has an interest in the matter acquiesces in them, but as to underground percolations no rights are gained, because nobody knows anything about them.

There is a marked and substantial difference between them, and it was there held that the owner of land through which water flows in a subteraneous course, has no right or interest in it, which will enable him to maintain an action against a land owner, who, carrying on mining operations in his own land in the usual manner, drains away the water from the land of the first mentioned owner, and lays his well dry.

Under the English decisions the owner of the land, if he be the first who mines, may work his vein up to his line—without leaving a pillar stand—and the owner of the adjoining property is required to leave the pillar, to keep out the water. Clegg v. Drearden, 64 Eng. Com. Law Rep. 575. "Adjoining owners owe no special duty to each other." The Locust Mountain Coal and Iron Company v. Gorrell Leg. Int. 29th March, 1872.

Under the rule here laid down, the plaintiffs working on a lower level, were bound to leave a sufficient pillar of coal standing, to prevent the water in the upper level from breaking through. And if they, or those under whom they claim have not done so, it is their own neglect, and becomes *damnum absque injuria*, for they must have known that the coal in the upper level would ultimately be worked out and be abandoned, and the water following its natural flow downward, would collect in the old workings, and *might* break through upon them.

The owner of a higher level may mine all his coal out down to his line, and he is not responsible for water that flows in the lower level by gravitation. Baird v. Williamson, 109 Eng. Com. Law Rep., p 375. See Smith v. Kenrick, 7 M. G. and S. 514; (62 Vol. Eng. Com. Law Rep.) as the leading case on this subject in England. See also The Duke of Beaufort v. Morris 6, Hare 340; also as bearing on this subject, see Kaufman v. Griesemer, 2 Casey 407; Martin v. Riddle, 2 Casey 415; Bentz v. Armstrong, 8 W. & S. 40; Merrick v. Packer, 1 Coxe 460; Williams v. Gale, H. & John, Rep. 230. If this was the only reason, an injunction certainly could not be granted.

The second point made by the plaintiffs is, that having purchased from two of the defendants, and acquiesced in by the other partner, an easement or right to make an air-way through defendants' mines for ventilation of the Bast Colliery, they cannot be deprived of its use and enjoyment, after expending money in good faith for improvements, which must necessarily be the case, if the defendants allow the breasts in their old workings to fill up with water. *This is the strong point of the case.*

The plaintiffs claim an easement in the land of the Locust Mountain Coal and Iron Company, worked by and in the occupation of the defendants.

*An easement is a right which one proprietor has to some profit, benefit or lawful use out of, or over the estate of another proprietor.* Retgan v. Parker, 8 Cush. 145.

It is incorporeal and must consist of two distinct tenements, the *dominant* to which the right belongs, and the *servient* upon which the obligation rests.    Washburne on Easements, 2 Perrin *v.* Garfield, 37 Vt.312; Taylor on Landlord and Tenant, § 212 and notes (as to the distinction between easements and servitudes, see Rogers on Mine, 444).

After the owner has created a servitude or burden upon his lands, he cannot restrict the dominant owner in his use and enjoyment of that privilege.    It is as much protected as any other vested right, and carries with it every incident to its use and enjoyment.    Rogers on Mines, 445 ; Washburne on Eas. 25 and authorities there cited, 1 William's Saunders, 323 and note 6.    "*Whoever grants a thing, grants all that may be necessary to the enjoyment of the thing itself.*    Broom's Leg. Max. 362.

When the plaintiffs bought the Bast Colliery from Bast & Steinhilbert, for $193.000, one of the chief inducements (according to the affidavit of Mr. Pleasants) was to obtain the right to make this air-way, through the workings of the Little Mine Run Colliery.

Mr. Bast obtained that privilege from Taylor and Lindsay, under whom Jeremiah Taylor (who has been made a defendant) claims, and transferred it to the plaintiffs.

The consideration money was one dollar, and both transfers were recorded within the statutory time.

The sale was made by Taylor and Lindsay to Bast on 18 November, 1872, while they were owners of five-sixth of the colliery and in possession. Bast assigned his interest to plaintiffs on 4 December, 1872 ; both instruments were recorded on 26 February, 1873.    Jeremiah Taylor bought out Robert Taylor and Robert M. Lindsay's interest in the colliery 1 January, 1873, and he objects to the exercise of this right on the ground of notice.

*Are the instruments within the operation of the recording acts?*

The act of 18 March, 1775, (Purdon's Dig. 472 Pl. 76) requires all deeds and conveyances made in this state *of or concerning* any lands, tenements or hereditaments whereby the same may be in anyway affected in law or in equity, to be acknowledged and recorded in the county where such land lies, within six months after execution of such deeds and conveyances.    This includes any agreement concerning lands though not under seal.    Hellman *v.* Hellman, 4 R. 440 ; Shortz *v.* Unangst, 3 W. & S. 54; Funk *v.* Haldeman 3 P. F. S. 244.    These instruments were concerning the land and are clearly within the operation of the recording act.

The sale of this right was good as against R. Taylor and Lindsay, for they as tenants for years had authority to grant the easement.    Wallace *v.* Fletcher, 10 Foster 453.

And as these instruments were placed on record within six months, they were notice to Jeremiah Taylor.    The right attaches to the estate,

and not to the owner of the dominant tenement; and the easement followed the estate in the hands of the assignee. Taylor on Landlord and Tenant, § 238.

Jeremiah Taylor, therefore, took no greater interest in the colliery than Robert Taylor and Lindsay had at the time of the purchase. He took the operation not only subject to the covenants and conditions of the lease, but to all the restrictions placed upon it by his grantors. He took it subject to the charge, and the servient tenement followed in his hands. Taylor on Landlord and Tenant, § 238.

But Steinhilbert objects that he did not sign the instrument of 18th November, 1872, and should not be effected by it.

But this fact in my opinion cannot avail him under the circumstances of this case, for he was cognizant of the sale at the time; his interest in the Bast Colliery was enhanced by it; and he made no objection to it. *Qui non prohibet quod prohibere potest assentire videtur.*

It is therefore contended by the plaintiffs, that it was the act of the partners within the scope of the firm's authority, ratified by Steinhilbert, and as such, it is to be regarded as his own act. Story on Partnership, § 120–121–122; Cady *v.* Shepperd, 11 Peck 400; Shinner *v.* Dayton, *et al.* 19 John's Rep. 513; Grum *v.* Seaton, 1 Hall Rep. 262; Lord Lovelace case, W. Jones 268; Orr *v.* Chase, 1 Mer. 729; 4 Term. Rep. 313.

I think if he stood by and saw the plaintiffs pay more for the colliery than they otherwise would have paid without that privilege, and made no objection to it, but received the additional profit, it would be a fraud upon the plaintiffs to permit him to object now, and he is estopped from repudiating that contract, upon every principle of equity. Nass *v.* Vanswearingen, *et al.* 10 S. and R. 146; Rerick *v.* Kern, 14 S. and R. 271; Hill *v.* Epley, 7 C. 331–334; Commonwealth *v.* Moltz, 10 Barr 527, and and cases cited; Meason *v.* Kaine, 17 P. F. S. 126; Miller *v.* Miller, 10 P. F. S. 16.

The title then of the plaintiffs to this easement or privilege, is complete, and the right to exercise and enjoy it, is just as effectual in law as if they had paid a million of dollars for it.

Having this undoubted privilege, can the defendants now allow the mines to be flooded with water, and plaintiffs be deprived of their legal rights, without any default on their part? Before this can be done, it would seem right that reasonable notice should be given by the defendants, of their intention, to enable the plaintiffs to put up sufficient machinery to pump out the water, if by allowing the water to fill up, the easement would be destroyed. (37 Eng. Com. Law Rep. 255; 6 Bing. N. C. 256.)

The servitude which the defendants created on their colliery, and the principle of the common law, *Sic utere tuo ut alienum non laedas*, require such notice to the owner of the dorminant tenement.

This appears to be recognized by the defendants themselves, for Jere-

miah Taylor says in his affidavit, that a written notice of their intention to abandon the mines on the 1st September, was given the plaintiffs on the 14th August last.

This certainly was not *reasonable* notice for the work required to be done, for the bill alleges that it requires a year with dispatch, and the defendants have not denied or controverted that fact.

It is argued that under the act of 16th June, 1836, (Purdon's Dig. 590 P. L. 789), and its supplements conferring chancery powers on our courts, an injunction is a *preventive* remedy, and cannot be used preliminarily to enjoin the performance of any act.

It no doubt is a restrictive or prohibitory process to compel the party to maintain his status. The Mammoth Vein Coal Co.'s Appeal, 4 P. F. S. 183. Per Thompson, J.; Farmers' R. R. Co. *v.* Reno, 3 P. F. S. 224. Per Strong, J. Except upon a final hearing when the injunction becomes mandatory. Audenried *v.* Phila. & Reading R. R. Co., 18 P. F. S. 370. Per Sharswood, J. But when the agreement of parties requires performance, the remedy falls within the terms of the sixth clause of the second specification of the 13th Section of said act, P. L. 790, which confers upon the courts jurisdiction to afford *"specific relief,"* when the recovery of damages would be inadequate.

For instances where certain acts upon a preliminary hearing have been required to be done. See Lane *v.* Newdigate, 10 Vesey, 193, The Baptist Congregation *v.* Scannel, 3 Grant 48. Hepburn *v.* Landner, 2 Hem & Mil 321. See also, 3 bk. Blackstone's Com. 426, 427 and 428, and notes by Judge Sharswood. Lewis *v.* Comeford, 1 Vesey Jr. 235 and notes Fry on Specific Perf., §765-6-7; Newmarch *v.* Brandling, 3 Sw. 99; 4 Sim., 13; Whittaker *v.* Howe, 3 Beav. 383; Maxborough *v.* Bower, 7 Beav. 127.

But this case is different for the plaintiffs have an easement through the workings of the defendants.

This is established by the bill, affidavits and transfers, and no where denied. Jeremiah Taylor, says: *"that he and his partner never objected to the plaintiffs using the air-hole to ventilate their mines, nor to the plaintiffs pumping the water out of the slope level."* This concedes the plaintiffs' right as fully as the written instruments establish it, and places them in a position if this water became a nuisance to apply for this writ on those grounds. Rhea *v.* Forsyth 1 Wr. 507. See Bainbridge on Mines 509 where mines are in danger of being ruined. See King *v.* McCully 2 Wr. 76, where Judge Thompson recognizes this position when the *"right is clear and undoubted."* It is such a right that upon refusal to comply with the terms a court of equity might decree specific performance. Having this privilege or right then the law is well settled that the dominant owner may go upon the land and do necessary repairs. Rogers *v.* Morris 452; Washburne *v.* Eastments 25, 565, 566, 557; Taylor on Land. and Ten.

§214. For the express grant of an easement is accomplished by certain secondary easements necessary for the enjoyment of the principal one. Gale and Whatley on easements 231.

By the civil law the right to a servitude drew with it the right to do whatever was required for the fullest enjoyment of the servitude, and a man having that right might enter upon his neighbor's soil for the purpose of doing necessary works, but the owner of the dominant tenement was bound not only to exercise ordinary care and skill, but also to repair as far as he could, whatever damage his labor might have done to the servient tenement.—*Ib.* 25. Prescott *v.* Williams, 5 Met. 429; Prescott *v.* White, 21 Peck 341. (As to abatement of nuisance, see 6 Wharton 597.) The plaintiffs having this privilege, these authorities go far to show that they have a right to go on the land for the purpose of enjoying and using this right to its fullest extent, doing as little harm as possible.

In the Mammoth Vein Coal Co.'s Appeal, 4 P. F. S. 189, Judge Thompson held *that it would have been proper to enjoin the defendents, had it been made manifest that the consequence of their operations would have the effect of letting water in large quantities in the plaintiffs' mine.* These views are strengthened by Judge Agnew's opinion in The Locust Mountain Coal and Iron Co. *v.* Gorrell, *et al.,* Leg. Intel. 29 March, 1872, before referred to, in which he says: "When the miner in his upper mine in carrying forward his gangway strikes into a breast, which has been wrongfully worked by a trespasser up the dip of his coal vein, he is not justified in emptying the water flowing down the drain or gutter of his gangway into the opening thus struck, if by reasonable means he can carry the water into his own sump,"—and he holds that it is the duty of the upper owner to carry off his water even though a trespass had been committed upon him. He adds: *"To adopt the principle that an upper owner is liable for no act done within his own mine and no neglect, because it falls within his own proprietary right, would lead to results disastrous to mining in general and could not be tolerated."*

If equity upon a preliminary hearing in such a case will require the owner of the superjacent mine to keep out his water though a trespass be committed on his own land, *and though he has to do certain acts,* how much stronger is the present case, where the owners of the upper mine have sold the right to an air way which cannot be used and enjoyed unless the water is pumped out for a *reasonable* time.

It will be observed that adjacent owners working the same vein of coal *owe no special duty to each other;* that *subjacent* owners have a *servient* interest and *superjacent* owners a *dominant* interest; that a subjacent owner must receive the water in its natural channel downward, and must leave a pillar to support the works of the superjacent owner; while the superjacent owner working his mine with care and in the most approved method, is not required to control the natural flow of the water, (the

common enemy of the miner,) and may work his coal down to his line. When, however, the superjacent owner has created a servitude upon his land in favor of the subjacent owner, such as a right to pass over it, or the right to make up an air-way through his workings, the relative position of the parties changes. The subjacent owner then ceases to be servient and becomes the dominant, and the superjacent owner becomes the servient, so far as the terms of their agreement prescribe the rights to the use of the same under it. This conclusion appears to be undeniable and gives the plaintiffs the advantage of the decisions upon this point; for if they have this right they should have some remedy if it be infringed.

In the absence of any adjudged case like the present one, it may well cause the mind of a chancellor to hesitate, not only on account of the magnitude of the interests involved, but for the principle of law to be established.

Should I, therefore, refuse the injunction, the plaintiffs would have no remedy; as it is an interlocutory order, and no appeal lies (Hilbish *v.* Catherman, 10 P. F. S. 444,) and before a *final* decree could be made the mines of the plaintiffs would be irreparably destroyed; unless I should dismiss the bill before *answer* and *final hearing*, which the equities of the plaintiffs do not warrant. If the works be allowed to fill up, there would accumulate many millions of gallons of water, and with this superincumbent weight, the pillar or rib of coal at the top of the lower works must ultimately sink, and wide-spread ruin to the property of the plaintiffs and destruction to the lives of the men must inevitably follow.

I prefer, therefore, to be reversed, (if in error,) rather than by sustaining myself by an interlocutory order (if the law were otherwise) to cut off the appeal of the plaintiffs. The weightiest reasons show that this is a case for the supreme court, in order to ascertain how far a court of equity may preliminarily go in *affording specific relief*, where a recovery in damages would be inadequate; where the right is clear and undeniable; where the loss would be irreparable and of great magnitude, and where the danger to life is inevitable.

If I allow the injunction to remain in the manner to prevent the water from accumulating, at plaintiffs' expense, the defendants have an immediate remedy by appeal, without affidavit or security, and their damages can be readily compensated, for sufficient and approved bail have been entered to indemnify them; and as the supreme court have the final decision of this case, *let them assume the responsibility.*

> And now, October 27, 1873: This cause came on to be heard at this term, and was argued by counsel, and thereupon upon consideration thereof, it is ordered adjudged and decreed as follows : that the special injunction issued against the defendants, remain until further order.

*George deB. Keim*, Esq , and *James Ellis*, Esq., for plaintiffs; Hon. *F. W. Hughes* and *James Ryon* and *J. W. Ryon*, Esq., for defendants.