## Lobach's Case.

The acceptance of a devise of land, charged with the payment of a legacy, creates a personal liability for its payment on the part of the devisee.

A judicial sale of land divests it of the lien of a legacy payable in annual instalments, not due and payable at the time of the sale.

APPEAL from the decree of the court of common pleas of *Cumberland* county.

The real estate of Peter Lobach, deceased, was sold by the sheriff for 3530 dollars, and the proceeds were brought into court for appropriation: they were claimed respectively by Joseph Taylor, the administrator *de bonis non*, with the will annexed of Andrew Lobach, deceased, by the judgment creditors of the said Peter Lobach, deceased, and by Gilbert Searight, under a voluntary assignment for the benefit of his creditors, made by Peter Lobach, in his lifetime. The questions arose out of the construction of the will of Andrew Lobach, deceased, by which Peter Lobach derived the land which was sold. The material parts of that will are as follows:

" And as for my dwelling plantation whereon I now live, I give and devise the same unto my two sons which are here with me now, containing two hundred and thirty-seven acres and some perches, and the allowance, and also fifty acres of mountain land, together with the same, unto my said two sons, Joseph and John Lobach, undivided under and subject.

"The following payments and dowry, and also, for a certain time, five horse creatures, my two wagons, my ploughs and harrows, until my debts is all paid out of all my lands; and I give also each of them, my said sons, a cow out of my stock soon after my decease. And the said two sons shall jointly, according to each one's share of the land, so as they may at any time divide the same, all the aforesaid dowry and reservations, unto my said wife give and observe unto her yearly and every year, as above mentioned.

" They shall also pay for the said plantation the sum of 40 dollars per acre, and for the mountain land they shall pay 20 dollars per acre, in the following payments; that is to say, in 400 dollars yearly payments, until the whole is fully paid for; and this, my last will and testament, shall be their sufficient right and title to have and hold the said two tracts of land, under the same right as I myself possess, to them, their heirs and assigns forever.

" And whereas I have a certain plantation in South Middleton, Cumberland county, containing two hundred and sixty-two acres, and the allowance, whereon my son, Peter Lobach, lives now: I

[Lobach's Case.]

give and devise the same to my said son, Peter Lobach, his heirs and assigns forever, under the same right and title as I myself possess, under and subject to the following payments; that is to say, he shall pay for the said land the sum of 30 dollars per acre, and he shall pay the sum of 400 dollars yearly until the whole is fully paid, of which he hath already paid the sum of 1800 dollars, which is to be deducted off of the whole.

"And whereas I have a certain plantation also in South Middleton township, Cumberland county aforesaid, containing one hundred and seven acres and the allowance, whereon my son, Samuel Lobach, lives now: I give and devise the same unto my said son, Samuel Lobach, and to his heirs and assigns forever, under the said right and title as I possess, for the payment of 30 dollars per acre; and he shall yearly pay the sum of 100 dollars until all is paid, of which he hath already paid the sum of 207 dollars, which shall be deducted off of the whole. And in case my said widow should not choose to live here with my first two mentioned sons, and should go away from them, then they shall pay yearly unto her the sum of 100 dollars for her dowry. [I also have considered now that the five horses and two wagons and two ploughs, which was mentioned before unto my two sons, Joseph and John Lobach, for a time, the same I give and bequeath them altogether, with the gears belonging to the horses.] And all the remainder of my personal estate shall be sold by public sale after my decease, towards paying my debts; and after my debts is all paid out of my estate, then all the remainder of my estate shall be equally divided amongst all my children, sons and daughters; but my daughter Polly shall have two cows of my stock, in the first place, and five sheep. It is also to be considered that my eldest daughter, Elizabeth, the wife of Alexander Searight, is advanced by me to the sum of 100 dollars more as my other daughters, which she shall be charged with, to make her even with the rest; and then, when the debts is all paid, I order that my son Abraham shall have the first payment that becomes due.

"N. B. After consideration, I order that whenever my debts is all paid, then the yearly gales shall be diminished, and only be 300 dollars a year on this, my plantation here; and my son Peter shall also pay 300 dollars, yearly gales; and my son Abraham shall have the first gale of 300 dollars, and then still the oldest in rotation, sons and daughters, each of them 300 dollars a year; and in the last rout they shall all be made alike in their shares.

"N. B. The yearly payments of Samuel Lobach, of 100 dollars yearly, shall also be divided equally unto all my children. And lastly, I nominate and appoint my two sons, Abraham and Peter Lobach, executors of this, my last will and testament, In witness whereof I have hereunto set my hand and seal, this twenty-second day of July, in the year of our Lord one thousand eight hundred and eighteen. Signed, sealed, published, and declared by the said

[Lobach's Case.]

Andrew Lobach, as his last will and testament.   N. B.   My daughter Polly shall have her furnishment equal with my other daughters.

"ANDREW LOBACH.

"Proved first day of August 1818."

Each of the devisees under this will took possession of the respective properties devised to them.

First administration account of Peter Lobach, confirmed the 22d of February 1825, and the balance in his hands on that settlement was 178 dollars 67¾ cents.

In 1830 Peter Lobach settled a second administration account of his father's estate, in which he charged himself with money received from John, Joseph and Samuel, paid on account of their land to the amount of 1687 dollars 62 cents, and prayed a credit for the payment of debts of the estate to the amount of 3971 dollars 72 cents, exhibiting an over payment by him of 2284 dollars 10 cents.   He paid a small amount of debts after the settlement of this account. The land devised to Joseph and John was sold, at sheriff's sale, for 5144 dollars, and the proceeds were claimed and paid to Joseph Taylor, the administrator *de bonis non*, with the will annexed of Andrew Lobach, deceased.

Samuel Lobach's land was still unsold, and in the possession of his heirs at law.

On the 4th of March 1835, several judgments were obtained against Peter Lobach, the plaintiffs in which now claimed the money in court.

On the 26th of March 1835, Peter Lobach made an assignment of all his estate, real and personal, to Gilbert Searight, for the benefit of his creditors.

*Hepburn* and *Alexander*, for the judgment creditors of Peter Lobach, deceased, appellants.

*Watts*, for Joseph Taylor, the administrator of Andrew Lobach, deceased, appellee.

The opinion of the Court was delivered by

KENNEDY, J.—The court of common pleas seem to have considered the several devisees of the lands, under the will of Andrew Lobach, as exempt from all personal liability, to pay the moneys or legacies charged thereon; and accordingly to have made their decree upon the principle that the lands alone were liable for the payment thereof.   In this, however, we think the court was mistaken; because it is evident from the whole tenor of the will, that the testator, not only intended to charge the several tracts of land with the amount of money directed by him to be paid thereon; but, likewise, in case of acceptance, to charge the devisee or devisees of each particular tract with the same, as the price thereof set upon it by himself.   This then being the design of the testator, as manifested by the terms of the will, the devisees can pretend no

VI.—W

title or claim to the land devised to them, except upon the conditions imposed by the testator; which are, that they respectively would pay the amount of money set upon their respective parcels of land as the price thereof, in the manner prescribed by the will. It is very apparent from the face of the will, that at the time of making it, Peter Lobach and Samuel Lobach, two of the devisees, named therein, were in the actual possession of the tracts respectively devised to them; and that Joseph and John Lobach, to whom the testator devised the third tract, lived thereon with the testator; and that these devisees having all, as may also be fairly inferred from the will, a full knowledge of the disposition which the testator intended to make by will of his real estate, did in all probability express their approbation and assent in regard to it. And, accordingly, not only took possession of their respective parcels of land, intended to be given, or rather, perhaps, as it may be said, agreed to be sold to them, in anticipation thereof before the will was actually made; but Peter and Samuel, it would seem, from the will, paid to the testator a part of the money mentioned therein, as the price at which their lands are thereby given to them.    But be all this as it may, it is certain, that after the death of the testator, Peter and Samuel being in the possession, which they had obtained previously, of the lands respectively devised to them, and Joseph and John having thereupon taken possession of the land devised to them, all being thus in the possession of their respective devises, thereafter continued to hold the same to the entire exclusion of the other heirs and children of the testator.    This, perhaps, without more, ought to be considered sufficient evidence, in ordinary cases, to establish an agreement on the part of the devisees, to take the lands devised to them upon the terms and conditions set forth in the will; and likewise of an engagement on their part to fulfil and perform them, whatever they may be.    But in the present case, each of the devisees of the lands has still gone further, and in conformity to the will, since the death of the testator, has paid a part of the money thereby directed to be paid by him for his land; thus showing, beyond the possibility of doubt or question, his assent to the devise, and an agreement on his part to pay the amount of the money fixed upon it by the testator as its price.   And can any one doubt, that, in justice to the other children of the testator, so far as the money, which is the price of the lands, is coming to them, after payment of the *testator's debts*, the devisees of the lands should not be held personally responsible for the payment of it, according to the will?    Every principle of reason and equity would seem to require that it should be so.    But we are not left to the guidance merely of our own reason on this subject; for, according to judicial, as well as other authorities, from an early period down to the present time, they have made themselves personally chargeable in law.    In order to show that they are so, I refer to *Co. Lit. 9, b;* Wellock *v.* Hammond, cited in

Borraston's Case, 3 *Co.* 20, 21; S. C. *Cro. Eliz.* 204, 5; Collier's Case, 6 *Co.* 16, *a;* S. C. *Cro. Eliz.* 378; *Bendl.* 37; Spicer *v.* Spicer, *Cro. Jac.* 527; Greeve *v.* Dewell, *Ibid.* 599; Reed *v.* Hatton, 2 *Mod.* 25; 1 *Rol. Abr.* 834, *pl.* 5; 8 *Vin. Abr.* 222, *tit. Devise, S. a;* and the cases collected there.   Baddeley *v.* Leppingwell, 3 *Burr.* 1533; Frogmorton *v.* Hollyday, 1 *Bl. Rep.* 537; S. C. 3 *Burr.* 1618; Goodright *v.* Allen, 2 *Bl. Rep.* 1041; Loveacres *v.* Blight, *Cowp.* 352; Palmer *v.* Richards, 3 *Term Rep,* 356; Beesley *v.* Woodhouse, 4 *Term Rep.* 89; Baker *v.* Stocker, 5 *Term Rep.* 13; Andrew *v.* Southouse, *Ibid.* 292; Willy *v.* Holmes, 8 *Term Rep.* 1; Fagge *v.* Heasman, *Willes Rep.* 140; Hawker *v.* Buckland, 2 *Vern* 106; Ackland *v.* Ackland, *Ibid.* 687; Paddy *v.* Maddern,   *East* 496; Stevens *v.* Snelling, 5 *East* 87; Moore *v.* Denn, 2 *Bos. & Pul.* 247; Briscoe *v.* Clarke, 5 *Ibid.* 343; Jackson *v.* Bull, 10 *Johns.* 148; Glen *v.* Fisher, 6 *Johns. Ch. Rep.* 34, 5; Ruston *v.* Ruston, 2 *Yeates* 54; S. C. 2 *Dall.* 243; Burkhart *v.* Bucher, 2 *Binn.* 464.   By these authorities it will be seen, that it has long since been the settled law of England, and adopted as such here too, that whenever the testator devises land without words of limitation, directing a sum of money to be paid absolutely by the devisee, though it may be less than even one year's profits of the land, yet if he accept thereof, he will become personally chargeable with the money, and entitled to a fee-simple estate in the land.   The words of the devise in such case, unconnected with the direction to pay the money, would only confer an estate for life upon the devisee, but as an equivalent for his having to pay the money absolutely and at all events, and becoming personally liable therefor, it is presumed that the testator intended he should have a fee-simple that he might be completely indemnified. This is upon the ground, that it must always be presumed that the testator intended to benefit the devisee by the gift, which might not be the case, if the devisee were only to take an estate for life; because he might chance to die immediately after paying the money, before it was possible for him to receive any profit or advantage whatever from the land.   If, however, the testator has directed that the money shall be paid by the devisee out of the profits, after they shall have been received by him, the payment of the money in such case is only contingent, or conditional as it were, and the devisee only takes an estate for life.   In short, the distinction seems to be that whenever the charge is made on the *estate alone,* and there are no words of limitation, the devisee takes an estate for life only, but where the charge is on the *person* of the devisee in respect of the estate in his hands, he takes a fee by implication.

Here, however, in the case before us, the testator has not only directed the moneys to be paid absolutely, and at all events, by the devisees, thereby charging them *personally* with the payment thereof, but he has expressly given estates in fee to them, in their

lands respectively devised to them, which makes the case still stronger in favour of the testator's intending to charge the payment of the moneys on their persons, as well. as on their estates in the lands devised.

There is, however, another aspect in which this case naturally presents itself, which shows very clearly, that the testator intended to make the devisees of the lands personally responsible; and that in law, justice and equity, they ought to be so held, after having accepted thereof. The testator had nine children in all; the devisees of the lands were four of the number; now it is perfectly certain from the provisions of his will, that he intended all should participate in his estate; and it is probable that he may have designed to distribute it equally among them; indeed, it is certain that he did, if the estimate in money put on the lands by him, was equal in amount to what he considered their full value. But, whether it was so intended by him or not, it is clear, that whatever he thereby gave to each of his children, he intended that he or she should have and receive it without fail. But it is obvious, that his design in this respect, might readily be defeated, unless the devisees of the lands were to be held personally chargeable with the payment of the moneys directed to be paid by them. For, suppose the lands should happen to fall in price before the moneys were paid, the devisees thereof, might refuse to pay, and suffer the lands to be sold, after having been in the possession and enjoyment of them for years; and to make the matter still worse for the other children or legatees, after having wasted or suffered them to fall into a state of dilapidation, so as to render them of less value greatly, than the amount of the moneys directed to be paid for them. By this means, the other children would be the losers, while the devisees may be considerable gainers, perhaps to the full amount of all the testator intended to give them; or at any rate, they had it in their power, no doubt, when they took the lands, to have sold them for the amount of the valuation put on them by the testator, as he could have no interest in valuing them above what they might then have been sold for; and in this way have realized the full amount intended for them by the testator, while the other children have no alternative left to make choice of. If the lands fall greatly in price, they must lose, but can gain nothing though the lands should increase in value to double the amount of the testator's valuation. In this latter event, the increase of value enures exclusively to the benefit of the devisees of the lands, if they still continue to hold them. It is manifest, therefore, if the lands only are to be held liable for the payment of the moneys directed by the testator to be paid to the other children, that it is placing all the advantages on the side of the devisees, by permitting them to keep the lands, however much they may increase in value, upon paying the moneys mentioned in the will, but to give them up at any time they please if they should decrease in value, and the devisees find it not to be

[Lebach's Case..]

their interest to hold and pay for them. It does not seem to be just or equitable, that such a principle should obtain; for, if the devisees of the lands are permitted to relinquish them, when they cease to be worth the moneys ordered to be paid on account thereof, they ought, on the other hand, when the lands rise in value, if they wish to hold them, to be compelled to pay according to their increased value, so that the profit and loss, arising from such cause, may be made reciprocal, and be enjoyed or borne equally by all.

It has, however, been suggested, that if the devisee is to be held personally responsible, the land cannot be considered as bound. But surely, the two securities are not at all incompatible with each other; and there is no reason why both should not be bound for the payment of the money: equity certainly requires, that the land should be, and the implied engagement of the devisee, arising from his acceptance of the devise, is sufficient to hold him so in person. In England, the vendor of land, who has divested himself of the legal title by making a conveyance of it to the purchaser, and taken his bond or note for the payment of the purchase money, by which the latter becomes personally bound for it, has also, in equity, a lien upon the land for payment of it. See *Sug. Vend.* 388, *et seq.* and the cases there referred to in the margin. But the claim of the legatee, in equity, to hold the land bound, as well as the person of the devisee, is still stronger than that of the vendor, who has voluntarily, by an act of his own, relinquished all his right and title to the land, and at the same time, in consideration thereof, accepted of a mere personal security; because the legatee has parted with nothing, that he had any right to retain as a security: and, although the devisee may be said to be invested with the legal title to the land, under and by virtue of the will, yet that is liable to be defeated, unless he afterwards pay the money. The payment of the money may be considered either as a limitation, or a condition annexed to his gift. Suits brought in chancery by legatees against the devisees of the lands, to recover the legacies ordered by the testator to be paid by the devisees, have been proceeded in generally against the lands, on the ground of their being liens thereon; and this may be one reason why little or nothing is said in them about the personal liability of the devisees. And this, also, goes to prove, if an action will lie against the person of the devisee, as I shall show, I think presently, that it will, that the legatee may proceed on the liability of the land, or that of the person of the devisee at his pleasure; or on both here in the same action at law, as we have no court of chancery. And accordingly, Chief Justice M'Kean, in Ruston's Executors *v.* Ruston, 2 *Yeates* 61, where the devisee of the lands was held personally liable in an action of debt for the money charged on the lands, after having accepted them, by taking possession thereof, says, " I consider the 3000 pounds as an *equitable*, if not a *legal* charge, which *affects* and *binds* the real estate devised to the defendant."

The doctrine advanced above does not, I admit, coincide altogether with every thing laid down on the same subject, in Brown v. Furer, 4 *Serg. & Rawle* 216; Gause v. Weiley, *Ibid.* 521, and Moore v. Rees, 13 *Serg. & Rawle* 436. In the first of these cases, the question decided, was not whether a personal action would lie against the devisee of the land, for the money charged thereon, after having taken possession of the land, but whether a personal action could be maintained jointly against him, and those to whom he aliened the land afterwards. And, it was held, that it could not. This may be right; for, independent of the reason that no joint promise by them was proved, and that there was no ground for implying any such, without one or other of which the action could not have been sustained against them jointly, there does not appear to be any striking reason, nor yet any principle of analogy in the law, by which the alienee ought to be rendered personally responsible by his having become simply a purchaser of the land from the devisee, without any express promise on his part to pay the money charged thereon. He thereby becomes nowise connected with, or otherwise responsible for the payment of it, than he would be for any other species of incumbrance, created prior to his purchase; as, for instance, for a mortgage, judgment or the like. In the second case, the question was, whether a sheriff's sale of the land, in which a fee tail estate only had been given by the will to the devisee, under an execution upon a judgment obtained against him in an action of debt for the legacy charged thereon, at the suit of the legatee, transferred a fee-simple to the purchaser at the sheriff's sale; and it was held, that it did. In the last case, the point raised and decided was, that the executors of one of two joint devisees of the land, and the surviving devisee could not be joined in an action of debt, brought against them and the executors of the testator, by the legatee.

It is, however, intimated very distinctly in these cases, that an action against the person of the devisee of the land, will not lie for the recovery of the legacy, unless he has expressly promised to pay it; and it is said, that the action, though in debt, is to be regarded as a proceeding *in rem*, wherein the judgment for the plaintiff must be *de terris*. The decision of the supreme court of New York, in Livingston v. The Executors of Livingston, 3 *Johns.* 189, would rather seem to have been the ground or authority, upon which this opinion was expressed, without, most likely, a very particular examination of the question, as it was not directly presented to the court for their determination in any of those cases. But it is far from being certain, that the supreme court of New York were afterwards satisfied themselves with their decision in Livingston v. Livingston; because, in Beecker v. Beecker, 7 *Johns.* 106, when the subject came up again before them, they declined giving an opinion upon the same question; and say, "whether a suit at law will lie against the devisee or terre-tenant, while in

[Lebach's Case.]

possession of the land and without any promise to pay, the court give no opinion." And, subsequently, in Van Orden *v.* Van Orden, 10 *Johns.* 30, it was ruled by the same court, that an action of *assumpsit* would lie in favour of the legatee, against the devisees of the land, charged with the legacy, to recover it, on the ground of their having provèd the will after the death of the testator, taken possession of the estate devised, and having paid part of the legacy, without any express promise having been made. And Chancellor Kent, afterwards, who, as chief justice of the court, delivered the opinion thereof, in Beecker *v.* Beecker, decided as chancellor in Glen *v.* Fisher, 6 *Johns. Ch. Rep.* 34, 5, where land was devised, charged with the payment of a legacy, that the *mere acceptance* of the devise by the devisee, rendered him *personally* and *absolutely* liable to pay the legacy, and he decreed accordingly. But this very question had been decided in the same way, long previously to that by this court, as early as 1796 at least, in Ruston's Executors *v.* Ruston, already cited. It seems, however, not to have been brought to the notice of the court, in the cases of Brown *v.* Furer, Gause *v.* Weily, and Moore *v.* Rees. The action, as has been mentioned above, was debt; and a recovery was had against the devisee of the lands personally; though, there never had been a promise made by him to pay: on the contrary, he denied, that either he or the lands were liable: but he had taken possession of them; and according to the terms of the will, by this alone, rendered himself liable in the opinion of the court, to pay the money. Chief Justice M'Kean says, in delivering his opinion, 2 *Yeates* 61, "The defendant *took possession* of the lands devised to him. This evidences his *assent to pay* the 3000 pounds, and the *intention of the testator*, that he *should pay* it to the executors, is too plain to bear an argument." And afterwards he repeats, "it was the manifest intention of the testator he should *pay at all events.*" Mr Justice Yeates likewise says, "It was clearly *the intention* of the testator, that the 3000 pounds should be raised *at all events.* The defendant *accedes* to his father's terms and *submits* to the monied charge *by his entry on the lands* devised to him." And Mr Justice Smith also repeats, "he is *bound*, having *taken possession* of the land, *to pay the money.*"

In England, legacies payable out of the personal assets, were, if not originally and first of all, certainly at a very early period, and long before the establishment of a court of chancery, cognizable in the spiritual courts. But afterwards, when these courts ceased to have jurisdiction of them, chancery claimed and exercised it; and, therefore, little appears in the books of the common law courts, entertaining suits for the recovery of such legacies, unless during the time of the commonwealth, when the spiritual courts were deprived of all jurisdiction over such matters. Nicholson *v.* Sherman, 1 *Sid.* 45, 6; S. C. *T. Raym.* 23. But in regard to legacies charged on lands alone, the spiritual courts never did, at any time,

[Lobach's Case.]

take cognizance of them. They had no jurisdiction over any thing relating to lands, though it did arise out of last wills. Paschell *v.* Kiterich, *Dyer* 151, *b*; *Benloe* 60; Sambern *v.* Sambern, 2 *Bulstr.* 257; Reynish *v.* Martin, 3 *Atk.* 333, 4; consequently, before the court of chancery came into being, and commenced exercising its authority over the subject, it is reasonable to conclude, that the legatee in case of a legacy charged on land, must have been entitled to a remedy of some kind in the, common law courts; otherwise, he would have had a right without a remedy, which could not be, as it would have been contrary to one of the first maxims of the common law. In Nicholson *v.* Sherman, 1 *Sid.* 46, and *T. Raym.* 24, Twisden, J. said it had been adjudged in his time, that if one by his will devised a legacy to be paid out of his land, or out of the profits of it, an action would lie for it in that court, (King's Bench) which was conceded by the other judges. Lord Coke also, lays down the same principle in Sambern *v.* Sambern, 2 *Bulstr.* 257. And Lord Holt, last, though not least, declared in Ewer *v.* Jones, 2 *Lord Raym.* 937; S. C. 2 *Salk.* 415, that he made no question of it, that an action at law might be maintained by the legatee in such case against the devisee of the land. It would, therefore, seem to be difficult, if not almost impossible, to resist the conclusion, that in England, before chancery took cognizance of such cases, the common law courts must have entertained suits in favour of the legatee against the devisee of the land. And here in Pennsylvania, there can be no reason whatever assigned, why it should not be so, seeing we have no other courts to which recourse can be had for relief or redress in such cases.

It was material thus to show that the devisees in this case became personally liable by accepting the lands respectively devised to them, for the amount of moneys charged thereon; because we are of opinion that the judicial sales made of the lands of Peter, Joseph and John, respectively, discharged these lands, so sold, from all future liability to the instalments that were to become payable subsequently: but the lands having been sold for less than the estimate or valuation put on them by the testator, and Peter, Joseph and John being each liable personally to pay the full amount of the testator's valuation on their respective lands, can claim no part of the moneys arising from the sales thereof, until the other children and legatees of the testator shall have received out of the fund so raised, an amount equal to that charged upon the lands in their favour respectively, according to the valuation of the testator. If, however, it were so, that they had not become personally responsible, then perhaps it would have been right that they, or those claiming under them, should have come in for an equal proportion of the moneys made by the judicial sales. But that not being the case, and the amount of the sales considerably less than the testator's valuation, and the devisees of the lands being likewise in default, and by this means the occasion of the loss, it is obvious that

in justice, they can have no claim upon the funds in question until the others are satisfied the full amount of their respective proportions, according to the valuation of the testator.

But it has been argued by the counsel for the creditors of Peter Lobach, that the sale made by the sheriff, of his land, did not discharge it from future liability for those instalments of the money charged thereon, which were to become payable, according to the direction of the will, subsequently thereto: that the sale must be considered as having been made subject to those subsequent payments in the same manner that it would have been liable afterwards to the payment of subsequent *quit-rents* accruing thereon, had it been subject to such a reservation as was decided in Share *v.* Anderson's Executors, 7 *Serg. & Rawle* 63. This very point, however, was ruled otherwise by this court in Hellmon *v.* Hellmon, 4 *Rawle* 440; where it was held, that the lien of a legacy charged upon land and payable by instalments, as in this case, was discharged by a judicial sale of the land, though some of the instalments, for which that action was instituted against the terre-tenant, did not become payable according to the terms of the will, until after the sale. The cash amount of the whole legacy is susceptible of being ascertained with certainty; and, if it be the first lien, must be first paid out of the moneys produced by the sale. If any part of it has become payable before the sale, the amount of such part is to be ascertained by adding interest at the rate of six *per cent per annum* to the principal, so due, from the time it became payable to the time of the sale; and the instalments which have not as yet become payable are to be reduced to their cash amount or value at the same rate, according to the rule of rebate and discount.

The personal liability of the devisees having been shown, it removes at once the objection to allowing the principle of set-off in adjusting and distributing the estate agreeably to the directions of the will, which presented itself to the minds of the court below; and therefore, whatever may be coming to Peter, will belong to his judgment creditors, who acquired liens upon his land before the sale thereof, and before he assigned to Gilbert Searight, in preference to the assignee.

It has been claimed also, that Peter and Samuel Lobach were entitled, upon the death of the testator, to have the instalments thereafter directed to be paid by them respectively, postponed on account of the payments made to the testator in his lifetime; so that Peter, having paid 1800 dollars to the testator, was not bound to pay any thing more until five years after the death of the testator, when his first payment, which was only 200 dollars at most, as is contended, (200 dollars of it having been paid to the testator,) became due; and Samuel, having in like manner paid 207 dollars, was not liable to pay any thing more for three years after the death of the testator. In this there does not seem to be even the show of equity; because both Peter and Samuel were in the full and exclusive

VI.—X

[Lobach's Case.]

occupation and enjoyment of the lands respectively devised to them at the time and before the making of the will by the testator, as appears by the will itself, and doubtless, too, before they paid the moneys which are thereby acknowledged to have been received by him. This may fairly be considered as an adequate compensation for the payment of the money in advance. Being thus, then, compensated by the receipt of the rents, issues and profits of the lands, there is no reason why the money, remaining to be paid by them after the death of the testator, should be postponed on the ground of equity, beyond the time mentioned in the will; which directs that 400 dollars shall be paid yearly by Peter, and 100 by Samuel. As the will was not to take effect until after the death of the testator, the time for making these payments was, of course, not to commence before that; but there being no time given by the will to the devisees for commencing their yearly payments beyond that period, it must be considered as the starting point of time, counting from which, at the end of every succeeding year the payment of an instalment, of the sum required to be paid, was to be made. This would also appear to have been the plain meaning and intention of the testator; for he provides, that out of the first instalments directed to be paid, and his personal estate, which fell greatly short of being sufficient of itself, his debts should be first paid; and after that, the residue should be divided as therein mentioned, among all his children; and that the yearly instalments of Peter, and Joseph, and John, should then be reduced from 400 dollars to 300. Now, if the construction contended for on behalf of Peter were to be received, then there would, on the death of the testator, have been no money coming in from the devisees, except the single instalment of 400 dollars yearly from Joseph and John, for the space of five years thereafter, excepting two instalments of 100 dollars each, that would have been payable by Samuel at the end of three and four years, wherewith to have paid the debts: but certainly it is not reasonable to suppose that the testator could have imagined that his creditors would be willing to wait a period of five years and upwards, for the payment of their claims: nor can it be believed, from all he has said in his will, that he intended his other children should be postponed to such a protracted period, before they should even begin to come into the receipt of their portions, which were not to commence being paid by the devisees of the land, until after the debts were all discharged.

The money being in the court below for distribution on the 1st of August 1835, a cash valuation, at this date, of the whole estate of Andrew Lobach, deceased, the testator, after payment of his debts, made upon the principles laid down above in the opinion of the court, becomes necessary, in order to ascertain the amount that would then have been coming to each of the nine children, the devisees and legatees named in the will, in case the devisees of the lands or their estates were solvent.

[Lobach's Case.]

First.—The amount of personal estate that came to the
hands of Peter Lobach, one of the executors, accord-
ing to his first administration account, settled in Feb-
ruary 1825,          -          -          -          -          -     $3,029 13
Amount that came to the hands of Abraham, co-executor
of Peter, for which Peter has taken credit in his ad-
ministration account, without charging himself, in-
cluding interest thereon to the 1st of August 1835,           252 91
Error in taking credit for 75 dollars paid Martin Fiches
instead of 75 cents, for one day's work, and the inte-
rest thereon to August 1st, 1835,      -          -          -     121 09
Judgment against Henry Fickle, *with interest to same
date*,          -          -          -          -          -          -     129 01
Secondly.—Real Estate.  Peter Lobach's land, valued to
him by testator in his will, at 7860 dollars, less 1800
dollars paid to the testator before making his will,
which was used by the latter in his lifetime, and
therefore can form no part of the estate disposed of
by his will, -          -          -          -          -          -     6,060 00
Add for interest, calculated at the rate of six *per cent
per annum* on all the instalments payable anterior
to the 1st of August 1835, and deducting therefrom
the discount at the same rate on all the subsequent
instalments of the residue of the valuation made by
the testator,          -          -          -          -          -     2,651 16
Joseph and John Lobach's land, valued by
testator at          -          -          - -          $10,480 00
Add on account of interest, as in Peter's
case, -          -          -          -          -      1,197 44
                                                        ——————     11,677 44
Samuel Lobach's land, valued by testator
at 3210 dollars, less 207 dollars paid to
the testator before making his will, and
used by him in his lifetime, and of
course formed no part of his estate,      -     $3,003 00
Add interest, ascertained as above, in Pe-
ter's case,          -          -          -          -          454 04
                                                        ——————     3,457 04

Amount of personal and real estate, according to a cash
valuation thereof, on the 1st of August 1835,           $27,377 78

Deduct debts of the estate:
First.—Amount paid as appears
by the first administration
account of Peter,      -          $2,850 45
Amount paid by second admi-
nistration account of same,          .

[Lobach's Case.]

| | | | |
|---|---|---|---|
| including interest thereon to the 1st of August 1835, except as to 178 dollars 67¾ cents balance in the hands of executor on first settlement, on which no interest is charged against him,   -    - | 6,277 91 | | |
| Debts paid by Peter since the settlement of his account, including interest to August 1st, 1835,   -   -   - | 439 68 | | |
| Debts remaining unpaid, with interest thereon to August 1st, 1835,   -   -   - | 1,919 77 | | |
| | | $11,487 81 | |

Residue remaining to be distributed,   -     -     $15,889 97

Add 100 dollars, advanced by testator to his daughter Elizabeth, which he has directed to be deducted from her share, -     -    -    -    -     100 00

Divided by 9, the number of children,   -    $15,989 97

Gives for each child's share 1,776 dollars 66⅓ cents, except Elizabeth, 100 dollars less, 1676 dollars 66⅓ cents.

Eight shares at 1,776 dollars 66⅓ cents,
equal to   -    .  -    -    $14,213 30⅔

Elizabeth's added,   -    -    1,676 66⅓

Shows the amount that would be coming to the nine children, were the devisees of the lands able to pay, $15,889 97

Statement showing the amount of Peter's accountability, chargeable with amount of personal estate, as per administration account of 1825,   -    -     $3,029 13

Error in crediting him with 75 dollars, paid M. Fiches,     121 09

Amount of credits obtained for debts paid by Abraham, his co-executor, with moneys of the estate received by him, with which he has omitted to charge himself,     252 91

Amount of money, with interest thereon, received from John Lobach,   -    -    -    -    -     1,409 47

Amount of money, with interest thereon, received from Joseph Lobach,   -    -    -    -    -     666 65

Amount of money, with interest thereon, received of Samuel Lobach,   -    -    -    -    -     692 33

Amount of the valuation of Peter's land, including interest, and deducting discount, as stated above,     8,711 16

Amount of debits,   -    -    -    -     $14,882 74

[Lobach's Case.]

Credit:

| | | |
|---|---|---|
| By first account, - - - | $2,850 45 | |
| By second account, including interest to August 1st, 1835, - - - | 6,390 77 | |
| By payments made since, including interest, - - - - | 439 68 | |
| | | $9,680 90 |

Balance in the hands of Peter Lobach to be accounted for, - - - - - - - - $5,201 84
Deduct amount of money made by sale of his land, - 3,500 00

Balance against him, - - - - - $1,701 84
Deduct this balance from what would be coming to him as his share, if Joseph and John were good, - 1,776 66⅔

This would be coming to Peter or his judgment creditor if Joseph and John were solvent, but he must bear his proportion of the loss arising from the deficiency of their estate and inability to pay the whole amount for which they are liable, which, as it will be seen, will more than merge this 74 dollars 82⅔ cents. - $74 82⅔

Amount for which Joseph and John are accountable, $11,677 44
Credit them:

| | | |
|---|---|---|
| By moneys paid Peter, - - - | $2,076 12 | |
| By sale of their land, - - - | 5,086 97 | |
| | | $7,163 09 |

Balance against them, - - - - $4,514 35
Deduct from this balance what would be the amount of their shares, in case of solvency, - - - 3,553 32⅓
Joseph and John being insolvent, here is a loss, which must be divided equally among the seven children, of 961 02
This loss to each of the six, is one-seventh, - - 137 29
The one-seventh of the loss by Joseph and John, deducted from Peter's share of - $1,776 66⅔
137 29

Reduces it to - - - $1,639 37
Being $62 46 more than the balance shown above; so that there is nothing coming either to him or his creditors.

It only remains now to ascertain the amount of the available funds, and after deducting therefrom an amount sufficient to discharge the debts of the testator still unpaid, to divide the residue among his six children, excluding Peter, Joseph and John.

Amount of sale of Peter's land, - $3,500 00
Amount of Joseph and John's land, 5,086 97
Amount for which Samuel is accountable,

[Lobach's Case.]

after deducting from 3457 dollars 4 cents,
the value of his land, 692 dollars 33
cents, paid to Peter, as stated above,          2,764 71
                                                        ——————
                                                        $11,351 68
Deduct amount of debts unpaid,     -        -      -     1,919 77

Residue to be distributed among the six children, that
  is, Abraham, Samuel and the four daughters,   -   $9,431 91
To do this, add for advancement to Elizabeth    -      100 00

Divide by     -       -       -       -       -    - 6)9,531 91

Each of the six children, except Elizabeth, entitled to   $1,588 65
Elizabeth to 100 dollars less, say     -       -      -    1,488 65
Five shares at $1588 65 each, equal to    $7,943 35
Elizabeth's share, $1488 65, added     -   1,488 65

Amount to be distributed among the six children,   -   $9,431 90

The decree of the court of common pleas is hereby reversed and annulled: and this court doth decree, order and adjudge, that the money remaining in the court below be paid to Joseph Taylor, administrator, with the will annexed of Andrew Lobach, deceased, the testator, to be distributed by him, after payment of the debts of the testator, among Abraham, one of the sons, and the four daughters of the testator, or their legal representatives—Samuel, another son, having his own portion, and more, in his own hands, will have to pay Abraham and his four sisters, instead of receiving any part of the moneys arising from the sales of Peter, Joseph and John's lands.

Decree accordingly.