## Zeigler's Appeal.

35　173
183　14

A sheriff's sale of land, in the absence of an express stipulation to the contrary, discharges all prior liens against the title of the former owner.

This is the general rule, founded on the universal practice of the courts; but if the sheriff sell, with an express condition, that the purchaser shall take subject to the lien of a mortgage, which would otherwise be discharged, the courts will enforce the contract.

The purchaser having bought at sheriff's sale, for $690, a property worth upwards of $5000, subject to a mortgage of $3785, which would otherwise have been discharged, in consequence of the existence of a prior lien, the legality of which was, at that time, the subject of great doubt, the condition will be enforced against his judgment-creditors, although the condition of the sale be not recited in the sheriff's deed; for the facts were sufficient to put them on inquiry.

A widow's dower, as ascertained by proceedings in partition under the Act of 1794, is an estate in law, and not a lien within the meaning of the Act of 1830, relative to the liens of mortgages. WOODWARD, J.

APPEAL from the Common Pleas of *Montgomery county*.

This was an appeal by Henry Zeigler from the decree of the court below, distributing the proceeds of a sheriff's sale of the real estate of Daniel Weikel.

In 1818, Benjamin Garber died seised of a messuage and tract of 65 acres of land, in Upper Providence township; and after his decease his administrators, under proceedings in partition, sold and conveyed the same, on the 2d December 1820, to Charles Garber, charged with the annual payment of $108.90 to the widow of the decedent, as and for her dower therein, and after her decease with the payment of the principal sum of $1815, unto the heirs at law of the said Benjamin Garber, deceased; "being the fund vested in said Charles Garber's hands for the payment of said annual dower." Hannah, the widow of the said Benjamin Garber, deceased, was still living at the trial of the cause.

On the 8th April 1851, by virtue of divers mesne conveyances, the said premises became vested in Henry Zeigler, the appellant, subject to the dower of Mrs. Hannah Garber therein, and to the payment of the sum of $1815 to the heirs of Benjamin Garber, at her decease.

On the 7th April 1853, Henry Zeigler sold and conveyed the premises to Charles G. Spare and Benjamin F. Spare, subject to the said dower, in consideration of the sum of $4285; and took from them a mortgage for $3785, to secure the payment of a part of the purchase-money. And Benjamin F. Spare subsequently conveyed his interest therein to Charles G. Spare.

[Zeigler's Appeal.]

On the 2d November 1855, under an execution issued on a judgment against Charles G. Spare, the premises were sold at sheriff's sale, and purchased by Daniel Weikel for $690. At that sale, the premises were sold subject to Zeigler's mortgage of $3785; and it was so understood by all the bidders, as well as the purchaser himself. Prior to the sale, Zeigler consulted counsel in reference to the effect of the sale upon his mortgage, and was advised that it would not be discharged by the sale. Daniel Weikel, the purchaser, also consulted counsel, and was advised that he would buy subject to the mortgage. The sheriff's deed to Weikel was acknowledged on the 19th December 1855, but there was no recital in it in reference to the mortgage.

In 1856, judgments were obtained against Daniel Weikel to the amount of $7000; and on the 4th December 1856, Henry Zeigler obtained judgment upon his mortgage, by confession, against the mortgagors and terre tenant; and under proceedings on this judgment, the premises were sold by the sheriff to William Yerkes, and the net proceeds of sale, amounting to $4275, were paid into court for distribution.

The auditor appointed to report distribution of the fund, being of opinion that the lien of Zeigler's mortgage had been divested by the first sheriff's sale, in consequence of its not being the first encumbrance on the property, awarded the fund to the judgment-creditors of Daniel Weikel. And his report was confirmed by the court below, the following opinion being delivered by SMYSER, P. J.:—

"If the amount secured to the widow and heirs of Benjamin Garber, deceased, on the sale of the land by order of Orphans' Court, in 1820, is to be regarded in the light of a lien or encumbrance, and not an estate, there can be no doubt that, under the Act of 1830, the legal effect of the sheriff's sale to Weikel, was to divest the lien of Zeigler's mortgage, because of the priority of the dower lien. Kurtz's Appeal, 2 *Casey* 465, must be regarded as settling this point. The counsel of the mortgagee question the policy of that decision, and its correctness as matter of law. But it is not for us to do so. We are bound by the decision of the Supreme Court *in consimilibus casibus:* otherwise all subordination and certainty in the law would be at an end.

"A very ingenious argument has been addressed to us, however, the object of which is to show that this case ought to be regarded as an exception to the rule laid down in the case just cited. The argument is this: dower, it is said, is at common law, an *estate* in the land; that it retains that character in Pennsylvania, notwithstanding our statutes on the subject, in all cases of intestacy, where the provisions of the statute have not been observed; and that, in this case, the widow of Benjamin Garber, not having signed the petition upon which the Orphans' Court appointed seven

[Zeigler's Appeal.]

men to make partition or valuation of his real estate whereof he died seised, and her consent thereto not otherwise appearing prior to said appointment, the proceedings, so far as dower was concerned, were irregular, without authority, and void, thereby leaving the widow's interest still an estate as at common law; and as such, incapable of affecting the otherwise priority of the Zeigler mortgage. The answer to all this, however, is that by the 13th section of the Act of 19th April 1794 (3 *Smith's Laws* 148), the widow's share of her husband's real estate given to her under the intestate laws, is expressly declared to be in lieu and satisfaction of her dower at common law. The Act of Assembly, therefore, works a radical change in the nature of her interest or estate, in all cases, of lands of which her husband died seised. Where the intestate's lands are adversely held and claimed at his decease, or where he aliens during his lifetime, without his wife joining in the conveyance in the manner prescribed by the Act of Assembly in order to bar her dower, or where, being seised during coverture, he relinquishes or abandons his right, or it is defeated by an adverse possession by the statute of limitations; in all such cases, she may *still, of necessity,* have her action of dower at common law, because the proceedings under the statute would not be an effectual remedy. But, wherever the intestate dies seised and the lands descend to his heirs, her right of dower at common law ceases, and she has, in lieu of it, either one-third of the land itself during life, if the same can be set apart, or the interest on one-third of the valuation money, if it cannot, or, in case of sale, none of the heirs taking at the valuation, the interest of one-third of the purchase-money. That dower is a statutory charge only in Pennsylvania, see Lauman's Appeal, 8 *Barr* 473; Hise *v.* Geiger, 7 *W. & S.* 274; *Price on Lim. and Lien* 253; Galbraith *v.* Green, 13 *S. & R.* 93; Pringle *v.* Gaw, 5 *Id.* 536. And this is so, not only under the Act of 1832, passed subsequently to the proceedings in this case, but under the Acts of 1794 and 1804, under which they took place, as the cases cited show fully.

" As thus transmuted by our Act of Assembly, is it a lien or an estate? It is sometimes called one and sometimes the other, as the cases referred to by Judge KNOX, in Kurtz's Appeal, show; but, as is there said, in regard to the principal sum representing her thirds, that is undoubtedly a lien only, and is in the nature of personal estate.

" But, besides,—the widow, who is still living, does not question the proceeding: nay, she has solemnly ratified it, by joining as administratrix, in the deed to Charles Garber, the purchaser, and by accepting and receiving her interest under it for more than thirty years; for the auditor's report shows a balance of interest unpaid to her of only $127.68, and it was admitted on the argument, that that was the entire amount claimed by her before the

auditor. That this estops her and her privies, see Herr *v.* Herr, 5 *Barr* 430; also, Lair *v.* Hunsecker, 4 *Casey* 119, 123, and the cases there cited.

" The question may also well be asked, by what authority could this court, after the lapse of nearly forty years, collaterally call in question the adjudication and decree of the Orphans' Court in a matter over which it had full and undoubted jurisdiction ?

" I conclude, therefore, that, even regarding the interest of the widow Garber as an estate in the land, it is one in no other or larger sense, than in any other case where dower is secured under our Act of Assembly; and Kurtz's Appeal covers all such.

" But was the operation of the *rule* of law defeated or rendered inapplicable to this case, by any agreement such as the law would enforce, that, regardless of the law on the subject, this land should be sold expressly subject to the lien of this mortgage ? And was it so sold and purchased ? And if it was, had the judgment-creditors of Daniel Weikel such notice as would bind them ? On this point of the case, I agree perfectly with the auditor in his conclusions.

" It must not be lost sight of, that the question here turns upon the point whether the parties knew or believed that in law, the lien of the mortgage would be divested by the sale, and intended to avoid this result, by a sale and purchase on terms which would, notwithstanding the otherwise legal effect, leave the mortgage to stand as a lien against the property, and pass the title expressly subject to it; for, if the sale was only subject to what the law would impose, then the law, and not their contract, must determine. Now it is very evident to my mind, from the *testimony*, that Weikel went to the sale under the impression and full belief that if he purchased, he would have to pay the amount of his bid to the sheriff, and the amount of the dower and mortgage besides, to the parties holding the same—in other words, that the sheriff's vendue would hold subject to both. He says he was so informed by his-counsel, J. W. Hunsicker, Esq., on the morning before he went to the sale; and this tallies with the repeated declarations made by the latter, his father, Judge Hunsicker, and others, to the same effect, whilst the sale was going on, and Joseph W. Hunsicker's own acknowledgments afterwards; and which show that the prevalent impression amongst them, probably founded on the opinion so freely expressed by J. W. Hunsicker, in whose opinion, as a lawyer, they would naturally confide, was the same as his.

" The conversation between Weikel and Zeigler, constituting the pretended agreement, was not until the former came to the premises, whither he came under the influence of the advice and opinion he had previously heard that morning from his attorney.

" This one fact furnishes a key to that conversation, and shows

that Weikel was negotiating merely for an extension of time or assurance of indulgence before committing himself to the purchase, believing that he would have to buy with Zeigler's mortgage on the property, and which might be pushed against the land to his prejudice and inconvenience, unless he had some stipulation or understanding for delay, beforehand. Nothing was said in that conversation, that is not perfectly consistent with that idea, or which might not have been said with equal propriety, if he had been urging an understanding to give him time on the dower or any other fast lien. It is true, as it has since turned out, that this was a mistaken opinion, and that the advice of his counsel was erroneous: Kurtz's Appeal settles that. But it is equally true, that at that time, the same opinion was entertained, and probably the same advice would have been given, by many other lawyers besides Mr. Hunsicker; and we are not to attribute a superior degree of legal lore and learning to the laymen attending the sale. And Weikel's subsequent declarations and statements, oral and written, are equally consistent with this view of the case, nor is it at all reasonable to suppose, that if the parties had negotiated an agreement by which a lien of nearly $4000, equal to two-thirds of its entire value, was to be imposed on the land, they would have left it to stand on a mere parol conversation, with no writings, no witnesses called, no public notice, nothing in the conditions of sale, the deed, or elsewhere.

"It cannot be said, in reply to this, that they relied on the fact that the mortgage was already on record and a lien; for the hypothesis is, that they were aware that the sale would discharge it, unless the legal effect of the sale would be obviated by a special arrangement, and were seeking to avoid such discharge and to reimpose the lien by such an agreement; and that without it the record would operate as, and show a discharge and extinguishment. Now is it conceivable that Zeigler, if he thought this, would stand by, see the property sold for $690, when it was worth over $5000, see his mortgage lien divested in land, and trust for the salvation of his large claim, the loss of which it is now urged upon us will ruin him, to so frail a security as a loose conversation in a corner, without writings or even witnesses, save what was casually and imperfectly overheard by one who came accidentally by where they were talking? He could not have been betrayed into this unaccountable remissness by the subsequent remarks of the Hunsickers and others pending the sale, and have relied on them to prove the special agreement between him and Weikel; for not one of them are testified to have spoken of any such agreement, but are only found giving their opinions as to the legal effect of the sale.

"Nor, if it be conceded, that the subject of the conversation between Zeigler and Weikel was such as is alleged, does it appear,

by any sufficient evidence, that a contract or agreement was arrived at. The *aggregatio mentium* does not appear. No definite arrangement seems to have been made, as to whether the whole was to be left, or two thousand dollars only, or what part or portion, nor for how long.

"Now this would be the case of a secret lien, of a lien created by agreement of the parties, which the record would show to have ceased legally to exist. Secret liens are abhorred by the law, on account of the risks to which they expose creditors and purchasers, and the room they afford for fraud, mistake, and perjury. The proof to establish them, even in cases where the policy of the law does not absolutely interdict them, should be clear, positive, distinct, and convincing. Nothing short of this should be permitted to overbalance the strong and well-founded objections to encumbrances of this character. Surely that cannot be pretended of the proof here.

"But suppose the proof were of that character. How far ought it to prevail in a case like the present? In Shultze *v.* Diehl, 2 *Penn. R.* 278, we have laid down for us the rule applicable where it is proposed to sell land at sheriff's sale clear and discharged of a prior mortgage since the Act of 1830. Judge Huston, delivering the opinion of the court, says: 'To effect this, it must be with the consent of the mortgagee, the *plaintiff at whose suit it is selling,* and of the defendant whose land is so sold. And this ought to appear in the levy, advertisement, and conditions of sale and in the deed. It will not do to let it rest on parol proof of what was said at the time of the sale; it must, in some shape, appear in the proceedings—must form a part of the record of the sale.' Nor is there any reason apparent to my mind why equal strictness should not be required where the attempt is to impose a lien, which the sale and the record thereof shows to have been satisfied in law and discharged. If anything, the reason is stronger than in the first case. Now, in the case before us, it is not even attempted to show that the consent of the plaintiff, on whose execution the sale was had, nor of the defendants, was had or even asked; nor is there one word of it in the conditions of sale, the deed, or on the record, in any shape.

"In Hellman *v.* Hellman, 4 *R.* 448, it is laid down, that in judicial sales, the law having prescribed the terms and conditions on which they shall be made, the sheriff has not the power to alter or change them to the prejudice of any of the parties, without the consent of all concerned. Surely, it is not any more competent for some one of the parties to make such an arrangement without the consent of the rest, than it would be for the sheriff himself, who is the officer and agent of the law to effect the sale. And in Umbehauer *v.* Aulenbaugh, 3 *W. & S.* 260, this rule is placed on the ground, that any other arrangement would

operate as a fraud upon subsequent judgment-creditors, because the purchaser taking the title without qualification or condition, with nothing on the record to show anything else than a clear and unencumbered title, was calculated to give him a false credit with those with whom he subsequently contracted debts, and who recovered judgments for those debts.

"So, in Randolph's Appeal, 5 *Barr* 245, it is said, that where the officer of the law to effect the sale, whether sheriff or administrator, undertakes to prescribe conditions other than those which the court or the law designate, 'it will not be permitted to affect as with a lien, interests subsequently acquired by third persons, either as purchasers for value or encumbrancers.'

"Now, it is not necessary to say whether such an agreement as is here set up, if distinctly proven, would bind the purchaser himself. Probably equity would enforce it: but the question here is as to subsequent judgment-creditors. Mode's Appeal, 6 *W. & S.* 280, and the cases above referred to, show clearly enough that, without notice, they would not be affected. This point I consider too plain to require anything further. Its opposite is not contended for.

"But would Weikel's judgment-creditors be affected by actual notice (for constructive notice is out of the question) of the alleged agreement to buy subject to the lien of the mortgage even if the law would divest it? I think not; and I think the cases of Mode's Appeal, 6 *W. & S.* 280, Hulings v. Guthrie, 4 *Barr* 124, and Uhler v. Hutchinson, 11 *Harris* 113, establish this beyond all doubt; and if they did not, Loomis's Appeal, 10 *Harris* 318, unquestionably does.

"Mode's Appeal was similar in all material respects to this. Carson's land was sold prior to the Act of 1830, on Eckstein's judgment entered 26th February 1828, and Kelty became the purchaser. There was a mortgage, entered in May 1825, for $5000, on which $4000 remained unpaid at the time of the sheriff's sale. The property was struck down to Kelty for $1795. It was worth from $7000 to $8000. It was alleged there, as here, by the mortgagee, that the sale was made subject to the mortgage; and that not only by the understanding and agreement of all parties, but by the terms of the conditions of sale. Other judgments were subsequently entered against Kelty, as here against Weikel. The real estate was sold as his property, and the proceeds, there as here, being brought into court for appropriation, Kelty's creditors, like Weikel's, claimed the money; and there also, as here, the mortgagee, who claimed priority of appropriation, by virtue of the parol agreement when the property was sold to Kelty, went into proof to show that the creditors of the latter had notice that Kelty bought subject to his mortgage, by express agreement, notwithstanding that in law, the sale would have dis-

charged it. The only difference in the cases is, that in Mode's Appeal, the mortgage was prior to all other liens, but liable to be divested by the judgment sale, because the Act of 1830 exempting prior mortgage liens was not yet passed. In the case before us, the mortgage was not the first lien, but liable, for that very reason, to be divested in spite of the Act of 1830. The effect of the judicial sale, however, was the same in both cases, by divesting the lien of the mortgage, unless saved by the agreement.

"Now, in Mode's case, the court say that the record showed the mortgage satisfied by the sheriff's sale and deed; that it was not in the power of the sheriff or purchasers or parties, to keep it alive as a mortgage, so as to affect third persons, by any understanding or bargain between themselves, or even by a memorandum thereof in the conditions of sale; because the conditions form no part of the record, and the record, therefore, would be silent on the subject. They say that it is not like the case of an unrecorded mortgage or deed, even; but that, at most, it is but a parol mortgage; to which, if it were competent for the parties to give the effect of a legal mortgage by reason of verbal notice to purchasers or creditors, the effect would be to overthrow the recording acts, and the acts relative to judgments and other liens. 'It would be inconsistent with the whole tenor of our decisions, contrary to the settled policy of the legislature, and productive of infinite peril to landholders and creditors, and of strife and uncertainty to the community.' They, therefore, conclude that it was unnecessary to inquire into the alleged notice to Kelty's creditors, as, if proven, it could not have availed the mortgagee.

"In Loomis's Appeal it was distinctly held, that while such an agreement might be in some sense legally binding on those who make it, it will not continue the lien on the land as against a subsequent purchaser or encumbrancer, even with notice: 'one who buys of the sheriff's vendee, or enters a judgment against him,' says Chief Justice BLACK, 'cannot be affected by such an agreement, even if he has notice of it.' 'The opposite doctrine would tend to create liens on land not found on record nor known to the law, and depending on parol proof.'

"Even a vendor, after he has once executed a deed and parted with the title, has no lien for unpaid purchase-money as against subsequent judgment-creditors with notice: see Bear *v.* Whisler, 7 *Watts* 147, and the cases there cited.

"In Hulings *v.* Guthrie, 4 *Barr* 124–5, this doctrine was applied to the case of an unrecorded mortgage; and it is expressly stated by ROGERS, J., who delivered the opinion of the court, that even equity would not postpone a subsequent judgment-creditor in favour of such a mortgage, notwithstanding he had notice before he entered his judgment; because the doctrine of notice, con-

[Zeigler's Appeal.]

structive or express, does not apply to creditors but to purchasers only. And in Uhler *v.* Hutchinson, 11 *Harris* 113, the same doctrine is impliedly recognised without being explicitly stated, inasmuch as the facts did not call for it.

"It may be said, that this is not the case of an unrecorded mortgage—that it remains on the record as formerly. But the same record also shows that it was extinguished in law. It has no continuing vitality. Being dead, if its life is renewed, it is by the resurrection or rather creative energy of the new agreement; and of that the record contains no trace. And hence I said a while ago, that there is no room for constructive notice in the case.

"But if notice would avail to postpone the judgment-creditor of Weikel in favour of Zeigler, the case would still fail the latter, for defect of proof to establish it, according to the standard of proof in Loomis's Appeal. Judge Hunsicker, the only one of the creditors present at the conversation between Weikel and Zeigler, we have already seen, heard nothing amounting to a contract or agreement, for the parties separated without coming to any. All the declarations of the others made pending the sale, that the purchaser would take subject to the mortgage and dower both, are consistent with the notion set afloat by Joseph W. Hunsicker, Esq., on the morning of the day of sale, and often reiterated by him through the day, that such would be the legal effect of the sale. That this was their view and understanding is further manifest, from their repeated references to the paper in possession of Joseph W. Hunsicker, containing the result of his searches of the office, clearly showing that they considered the records of the office as showing what the property would be subject to in the purchaser's hands, and not any private agreement of the mortgagee and purchaser, of which there is nothing to show they were ever informed, unless we wrest the evidence from its obvious import, to sustain such a view of it. The references to the dower and the mortgage, when they spoke of the subject liens, were couched in the same terms, and the two were always coupled together, evidently showing how they were associated in their minds. There is not one word showing that any distinction was made in their minds between the two, or that it entered any one's head that, whilst both would follow the land, the one would do so by operation of law, and the other by virtue of an agreement to set aside the law.

"Nor is it at all clear, that when Weikel's creditors afterwards acquired their claims and entered their judgments, they would be affected with notice, by anything they might casually have heard at any antecedent period, when they had no interest. Such has been the doctrine in regard to purchasers; and I know of no reason why creditors should be held to a stricter rule.

[Zeigler's Appeal.]

" I readily admit the hardship to Zeigler of having the property thus sold for a sum far below its value, under a mistaken idea that his mortgage would follow the land, instead of being paid out of the proceeds of sale—and thus losing his money. But his proper time to claim relief against the consequences of such a mistake was, before the acknowledgment of the deed, to come in and ask to have the sale set aside. After the deed is acknowledged, the title passed, and the money paid, it is too late for this. That this was his impression, and that therein lay his whole error, so fraught with injury to himself, the whole scope of the testimony compels me to believe.

" For these reasons I am opinion that the Zeigler mortgage, divested by operation of law, cannot be sustained in opposition to the lien-creditors of Daniel Weikel, on the ground of the alleged agreement."

The court having decreed distribution as reported by the auditor, this appeal was taken by Henry Zeigler.

*Boyd* and *Chain*, for the appellant, cited Ayer's Appeal, 4 *Casey* 179; Kurtz's Appeal, 2 *Id.* 465; Shaupe *v.* Shaupe, 12 *S. & R.* 9; Miller *v.* Leidig, 4 *W. & S.* 356; Thomas *v.* Simpson, 3 *Barr* 69; Catlin *v.* Robinson, 2 *Watts* 373; Hise *v.* Geiger, 7 *W. & S.* 273; Jackson *v.* Brown, 3 *Johns.* 459; Ragan's Estate, 7 *Watts* 441; Caldwell *v.* Walters, 6 *Harris* 84; Evans *v.* Mylert, 7 *Id.* 402; Smith *v.* Scudder, 11 *S. & R.* 325; Bellas *v.* Evans, 3 *Penn. R.* 479; Reigle *v.* Seiger, 2 *Id.* 340; Duey *v.* Clemens, 1 *Barr* 118.

*Krause, Longaker,* and *C. T. Miller,* for the appellees, cited Mode's Appeal, 6 *W. & S.* 284; Reed *v.* Reed, 1 *Id.* 234; Mohler's Appeal, 5 *Barr* 420; Lauman's Appeal, 8 *Id.* 475; Medlar *v.* Aulenbach, 2 *Penn. R.* 355; Swar's Appeal, 1 *Barr* 95; Hise *v.* Geiger, 7 *W. & S.* 274; *Price on Limitations* 253; Galbraith *v.* Green, 13 *S. & R.* 93; Pringle *v.* Gaw, 5 *Id.* 536; Kurtz's Appeal, 2 *Casey* 465; Randolph's Appeal, 5 *Barr* 242; Aulerbaugh *v.* Umbehauer, 8 *Watts* 50; Loomis's Appeal, 10 *Harris* 319.

The opinion of the court was delivered by

LOWRIE, C. J.—The judgment-creditors of Weikel claim to exclude Zeigler's mortgage from sharing in the proceeds of the sheriff's sale, on the ground that it was not the first lien, and that, therefore, it was discharged by a former sheriff's sale, though none of the proceeds of that sale were applied to it. It is perfectly clear, that the original sheriff's sale was intended to be subject to Zeigler's mortgage, as the supposed first lien, though there was no express condition to that effect. So the sheriff and

[Zeigler's Appeal.]

all the bidders, and Weikel himself, understood it, and so the price shows, and it is not now denied; and Weikel has confessed judgment on the mortgage, and on that the land is now sold.

We start, therefore, with the assumption that Weikel bought subject to the Zeigler mortgage, and with the further assumption (for sake of the argument), that the sheriff ought to have sold the land discharged of the mortgage; and this raises the question, must we treat the mortgage as discharged, notwithstanding the actual terms of the contract to the contrary? Let us first leave out of view the rights of Weikel's creditors, and ask—could he defend against such a mortgage, admitting that he had bought subject to it, and that, therefore, it was not paid out of the proceeds of the former sale, and assigning, as his only argument, that it was the sheriff's duty to sell discharged of the mortgage, and therefore it must be treated as if it had been so sold, even though the fact is otherwise?

The general rule of law certainly is, that judicial sales divest all liens, with some well-known exceptions; but in order to know how to apply this rule, in answering our question, it is important to notice, that the rule grows out of and depends upon the practice of the courts. There is no positive law directly imposing any such condition on the contract of sale and purchase; but the contract takes this character, without any express conditions, only because of the practice of the courts to sell discharged of liens.

Now, this practice does not infuse this or any condition or element into the contract, any otherwise than as other public laws and customs do the like with the contracts made within their respective spheres. All nations have their general customs, and it is under the influence of those that the people transact their business, and by the aid of those that their transactions are interpreted. And every trade, occupation, and profession has its customs, which enter in like manner into its peculiar transactions. Such customs are presumed to be followed, unless the contrary appears; for parties may choose to deal differently, and then the maxim applies, *conventio vincit legem.*

So it is with that species of transactions called judicial sales; they are to be understood according to the laws and customs constituting the practice of the court in such matters, unless it appears, in a proper manner, that the court has, in the given case, departed from the usual practice. Then the contract must be enforced as made, according to the maxim already quoted, and in order that individuals may not suffer from the irregular practice of public officers, which the maxim, *actus curiæ neminem gravabit,* forbids.

Now, if we may thus deal with and sustain departures from the common law, and from the customs of trade, it would seem plain

that we must do the like in relation to contracts which involve a departure from the customary practice of the court, and to save parties from suffering wrong by such irregularities which they do not occasion; and that, therefore, we ought to treat the sheriff's sale to Weikel as subject to Zeigler's mortgage, notwithstanding the general practice to the contrary.

But we cannot feel satisfied, in this case, with this summary deduction from general principles, without going further, and testing our deduction by the experience which our reports reveal to us on this very subject. How have judicial sales been treated in practice heretofore in analogous cases?

In relation to judicial sales of lands for the payment of debts, *the law* of the case was from the first that the courts had *authority* to sell them, clear of all liens, that could be discharged out of the proceeds. *The practice* of the courts in making sales, *how* they were to exercise this authority, was declared by no law. The form of the proceeding had, therefore, to grow up, from great varieties of practice, into consistency and uniformity. While in this formative state, it often presented anomalous cases that were very hard to solve. Indeed, the complications of the practice were such as often to cast doubt upon the principle itself.

As might be supposed, in the absence of any general regulation, the practice was, for a long period, in a very unsettled state; and the Supreme Court was very cautious about venturing on any generalizations of it, so as to declare when prior judgments, mortgages, and other liens were discharged, and when not: 3 *Yeates* 561; 4 *Id.* 316; 2 *Binn.* 231; 9 *S. & R.* 306; 13 *Id.* 229; 14 *Id.* 263.

It was, indeed, impossible to find any one rule of practice on this subject throughout the state. Perhaps the most nearly universal one was that which left it to the sheriff to fix the conditions at the sale, as subject or not subject to any prior liens, and which ones. This he generally did, on consultation with the parties interested in the sale or liens, or with their attorneys. This practice is traceable everywhere in the reports, and it was very properly treated as a question of usage or practice; for *law* on the subject there was none. Thus it is said, it was "usual" for the sheriff to sell free of liens; the execution "was considered sufficient *authority* for the sheriff" so to sell, and to pay out the proceeds accordingly: 2 *Yeates* 45; it was a "practice of long standing," and so on: 3 *Binn.* 358; 1 *Id.* 97; 13 *S. & R.* 229; 14 *Id.* 262; 9 *Id.* 306, 314; 1 *Browne* 97.

In the case of Febiger *v.* Craighead, as reported in note 3 *Rawle* 117, 134, Chief Justice SHIPPEN treated the matter as one of mere practice, and took the testimony of ex-sheriffs and lawyers to ascertain the usage; and it was shown to be, in the eastern

[Zeigler's Appeal.]

part of the state, that the sheriff sold with or without conditions as to prior liens; if without conditions, then it was considered as a sale free from liens; if with conditions, they defined what liens were to remain.

The traces and judicial recognitions of this, as a valid usage or practice, are very abundant in the reports. The case of The Presbyterian Corporation v. Wallace, 3 *Rawle* 109, shows three sheriff's sales on conditions as to prior mortgages. Hart v. Homiller, 8 *Harris* 248, shows two, subject to testamentary charges. Such conditions existed in both Mode's and Randolph's Appeals, 6 *W. & S.* 280, 5 *Barr* 242, and they were not sustained, only because of the rights of third persons who had no notice of them.

In Stackpole v. Glassford, 16 *S. & R.* 167, the apparent discharge of a mortgage by a prior sheriff's sale was allowed to be rebutted by oral testimony of an understanding to the contrary at the time of the sale; and the same was allowed in Tower's Appropriation, 9 *W. & S.* 105, and in Towers v. Tuscarora Academy, 8 *Barr* 297. In Barnet v. Washebaugh, 16 *S. & R.* 413, Mr. Justice ROGERS expresses the opinion of the court, thus: "We have no doubt that land may be sold (by the sheriff) subject to legacies, and then the land goes to the sheriff's vendee charged with their payment. But that it is so sold should expressly appear. It should be the clear understanding of all the parties."

In Mix v. Ackla, 7 *Watts* 316, there was an express condition subjecting the sale to a widow's encumbrance, and the court (GIBSON, C. J.) declared, that the expression of the condition was important and right, that a sale otherwise "would cast a ruinous obscurity over the biddings," whereas an express condition would "inform the purchaser exactly what he buys."

In Shultze v. Diehl, 2 *Penn. R.* 277, the sheriff's sale was understood by all to be clear of all liens, even a first mortgage, the Act of 1830 not being then known to have been passed, and it was held to discharge the mortgage, and it was paid out of the proceeds. In that case the court expresses itself by HUSTON, J., thus: "A levy and sale, subject to a lien, does not pass the land free from it." "All the parties to a transaction can modify the terms of it as they please, provided they do not contravene express written law, or public policy." "Where all understand the contract in the same way, I know of no case in which a party is subject to any conditions, or liable to any burden, not contemplated by any one. If the bargain is binding at all, it binds as it was made and understood, and this principle is as plain and as obligatory on the court as any other."

Any one can easily find other cases of conditions fixed at the sale, and also the approval of the practice often repeated: 3 *Yeates* 561; 3 *Binn.* 358; 11 *S. & R.* 135; 14 *Id.* 262. And

[Zeigler's Appeal.]

it also appears to have been a common usage to consult the prior lien-creditors, and then sell with or without conditions relative to liens: 9 *Id.* 314. And Mr. John Sergeant is reported, 3 *Rawle* 123, as saying that such was the case in Keene *v.* Swaine. Considering the unsettled state of the practice, no doubt this was a very common, perhaps the usual mode.

In view of these circumstances, it was very natural that the courts should slide into the presumption that a sheriff's sale was intended to be clear of encumbrances, if it was not made expressly subject to them, for such was the prevailing usage: 14 *S. & R.* 262; 16 *Id.* 413; 2 *Rawle* 56. Yet this presumption would, on the principle *cessante ratione legis cessat et ipsa lex,* be a violation of the true intention in such sales, if extended to places where the usage was to sell subject to all former liens.

That was formerly the usage in the western counties, as abundantly appears: *Brackenridge's Law Mis.* 258; 3 *Rawle* 134; 8 *Watts* 298. And this usage continued until after the decision of Willard *v.* Norris, and The Presbyterian Corporation *v.* Wallace. Shortly after those decisions, an attempt was made to recover from John Gallagher and James Park a lot on Second street, Pittsburgh, by an action of ejectment on a sheriff's deed, under a junior judgment, against a later sheriff's deed, under an earlier judgment, and the cause was decided in favour of the first sale. But this did such violence to all the known usages of the west, that it gave rise to an intense excitement, and the claim was given up, and no such proceeding was ever afterwards instituted. The decision was erroneous in applying the presumption, founded on one usage, to a case that proceeded on a reverse usage.

But this decision did no harm; for by common consent the old usage prevailed for past cases, and the rule in Willard *v.* Norris gave rise to a new and universal practice, to treat a sheriff's sale as discharging all liens, when no contrary conditions were expressed, and when the discharge was not prevented by any Act of Assembly, or by any inherent quality of the lien itself. To this extent the court has authority to sell, and to this extent the presumption of law is, that it does sell, where nothing appears to the contrary. In selling, the sheriff is the minister of the court, and is in law presumed to exercise all the court's authority. At first, this presumption was very weak, because the usage was uncertain and fluctuating. Now the usage is universal, and is not to be rebutted except by circumstances that demonstrate that it was not acted on: 16 *S. & R.* 413.

It is, therefore, the usage in such cases that makes the law. This was well expressed by Chief Justice GIBSON, in The Presbyterian Corporation *v.* Wallace, 3 *Rawle* 136, thus: "It is said practice, to be available, ought to be preceeded by judicial decision. It seems to me, however, that this would be an inver-

sion of the usual process of formation; judicial decision not being in any case a nucleus for the increment of law; but, as in the case of the tenant's right to the way-going crop, the recognition of it as a thing already established by the custom of the country."

We know of Mr. Justice KENNEDY's declaration, 4 *Rawle* 447-8, that the sheriff has no authority to make any conditions for continuing or discharging liens; but we notice also that he had just before said, that the sheriff cannot do so to the prejudice of any, without the consent of all. In another place, 1 *Barr* 95, he said, that the rule is "subject to exceptions, of course, whenever it cannot be applied without working manifest injustice." Mr. Justice ROGERS had before expressed the rule with a similar qualification: 1 *Penn. R.* 112. The sheriff has certainly no authority to make conditions by which liens shall be created: 8 *Watts* 48; 3 *W. & S.* 259; or excluded from distribution without consent: 10 *Harris* 312; or discharged, where the law has fixed them: 6 *Casey* 348.

The regular practice, in such sales, is, to sell discharged of liens; but departures from the rule are inevitable; and a sale made on an irregular condition, and not objected to by any one, will be confirmed by the court. Thus, an actual contract is made on faith in public functionaries, and with the concurrence of all concerned. How shall we afterwards treat the irregularity? Surely not so as to alter the contract, and cast the consequences of the irregularity upon strangers to the practice, if this can be avoided. We must, if possible, prevent the evil consequences by overlooking the irregularity, and respecting the actual contract, if no others have been misled by it. Official morality requires us to save individuals from suffering by the irregularities of legal practice. Yet the general rule of practice must stand as the law of such cases, and exceptions to it must come in only by way of equity; and, as equitable exceptions, they cannot be allowed without the sanction of the court, upon very clear evidence.

But here we come to another element in the cause. After the sheriff's deed to Weikel, and before Zeigler obtained judgment against him on the mortgage, several other creditors had obtained judgments against him, exceeding in amount the value of the property. Now, it is the very point in Mode's and Randolph's Appeals, 6 *W. & S.* 280, 5 *Barr* 242, that, as against subsequent judgment-creditors of the sheriff's vendee, all ordinary liens against the title of the former owner, including legacies, judgments, and, before the Act of 1830, mortgages, must be regarded as discharged, if the deed from the sheriff does not recite them as continuing. As against such liens, purchasers and subsequent encumbrancers are not bound or presumed to look back of the sheriff's sale.

It is otherwise as to mortgages since the Act of 1830. These

may continue their lien, notwithstanding a sheriff's sale; and purchasers and creditors must look for them. In searching, therefore, they found this mortgage remaining unsatisfied on the record. But it is answered that, on looking back near forty years, they discovered that there was another lien standing in the title; being a suspension, in favour of the widow of a former owner, of a part of the consideration on a sale by the heirs, to secure her thirds; and therefore the mortgage was not the first lien according to the Act of 1830, and is not protected.

Is this a sufficient answer to the mortgagee's claim to come in against the proceeds of the sheriff's sale? We think it is not. They saw that Weikel had bought at sheriff's sale for $690 a property, worth at such sale over $5000; that there was still an unsatisfied mortgage of over $3000 standing apparently against it; and they knew that this mortgage was still a valid lien, if there was no prior lien which, with the sheriff's sale, had caused its discharge.

Looking for such a prior lien, they found a deed, dated 2d December 1820, from the administrators of Benjamin Garber, conveying the land subject to an "annual dower" of $108.90 to Garber's widow for life, and to the payment of $1815, the principal sum, to the heirs at her death. Looking further, they found that the Orphans' Court had ordered that sale, and had directed that the suspended third for the widow's dower should be secured by mortgage.

Now these judgment-creditors stand in no better position than a purchaser would. Is, then, this state of facts insufficient to put a purchaser on inquiry? Would any man of common honesty or common prudence, in buying Weikel's title, suppose that he was dealing safely for himself, or fairly towards Zeigler, in treating the mortgage as discharged? Would any lawyer have advised a purchase of such a title without inquiry of the mortgagee? Surely there is but one answer to these questions.

And would any one have a moral or legal right to speculate on such a doubtful question of law and of legal practice, which might be readily solved by a fact that was easily ascertained, and then appeal to the courts to protect or reward his venture at the expense of honest men? If lawyers and judges are in doubt whether to call the widow's interest a lien or an estate, surely no purchaser would disregard a mortgage that appeared to be unsatisfied, and that could have been shown by the records of the court, in the distribution case on a former sheriff's sale, to have been left without appropriation in its favour; and no one would have purchased, treating it as having no existence.

And how can the court say that the subsequent creditors acquired their liens on the faith of a title clear of the mortgage, when no man of any ordinary legal skill would have given any

[Zeigler's Appeal.]

confident legal opinion in favour of so doing? They had not then the aid even of Kurtz's Appeal, 2 *Casey* 465. We think that they are not encumbrancers without notice of Zeigler's mortgage. Some day, no doubt, this peculiar form of question in relation to the discharge of liens will receive so clear and well-known a solution that all persons will know exactly their duty; but then other cases will be sure to present other questions just as difficult.

And now, February 16th 1860, the decree of distribution made by the Common Pleas is reversed, and it is now here ordered and decreed, that the money in court, after paying the costs of the audit and of this appeal, be paid as follows: to Hannah Garber $127.68, arrears of dower annuity; to Henry Zeigler the amount of his judgment on his mortgage against the land sold, so far as to satisfy the same, with interest up to the day of the sheriff's sale, and costs; and that the balance, if any, be applied to the other liens as set out in the auditor's report; and the cause is remitted to the Common Pleas, that this decree may be there carried into execution.

READ, J., filed a dissenting opinion. STRONG, J., did not sit, being interested in the question.

April 26th 1860, the following concurring opinion was filed by WOODWARD, J.—The ground on which I concur in the above decree is that the widow's dower was not a lien within the meaning of the Act of 1830, for the protection of the lien of mortgages, and, therefore, the sheriff's sale of the premises on a judgment junior to Zeigler's mortgage did not divest the lien of it.

That a tenant in dower has, at common law, an estate and not a mere lien, is not to be questioned. It is not necessary now to say what effect the legislation we have had since 1818 has produced upon the nature of this estate, for the proceedings in partition which resulted in ascertaining the value of Mrs. Garber's interest, and in charging it upon part of the land in question here, were had under the Act of 1794, and there is nothing in that act, nor in any decision under it, to justify the idea that the legislature meant to reduce the widow's rights in her deceased husband's estate from the dignity and durability of an estate, to a mere lien. It is true, that in Medlar *v.* Aulenbach and wife, 2 *Penn. R.* 358, Judge ROGERS speaks of it as a statutory lien charged upon the land, but the very point decided was, that it was so charged upon the land by the Act of Assembly, that the Orphans' Court had no power to divest it and substitute a different security. To call it a lien by way of expressing another additional security for the widow's rights, is not to deny its true character as an estate, and

[Zeigler's Appeal.]

this would have been harmless language, if it had not been under-
stood, differently from its meaning, to imply that she had nothing
but a lien.

In Shaupe v. Shaupe, 12 *S. & R.* 12, the widow's interest in
her husband's land, after partition in the Orphans' Court under
the Act of 1794, is defined to be an interest issuing out of lands
in all respects of the nature of a rent-charge. Accordingly, it
was held in Turner v. Hauser, 1 *Watts* 420, that her remedies
were those of a landlord against a tenant. "Without the benefit
of this construction," said Judge ROGERS, "the widow would be
only entitled to payment as a lien or judgment-creditor." This
shows that when that learned judge spoke of the widow having a
lien, he did not mean she was merely a lien-creditor.

In Deitz v. Beard, 2 *Watts* 171, the nature of the widow's
dower was drawn directly in question on an attempt to tax it.
This court held it was not taxable as money at interest, nor as
personal property of any nature whatever.

In Miller v. Leidig, 3 *W. & S.* 458, it was again defined as "a
rent charged on the premises recoverable by distress or otherwise,
and such rent is an incorporeal hereditament, real estate, and is
not within the power of a husband, like a chose in action, to
reduce into possession or dispose of."

In Thomas v. Simpson, 3 *Barr* 69, this rent-charge was held
to be such an interest in land as was bound by the lien of a judg-
ment, and would pass by a sheriff's sale.

Surely these authorities are enough to settle the question, if
any question can be settled by authority. The Act of 1830,
when it speaks of liens prior to mortgages, means liens in the
ordinary sense of that word, as judgments and mechanic's liens,
mere personal rights or securities—not an incorporeal heredita-
ment—an estate in land, like a widow's dower. A landlord has
distress as a remedy for his rent, because he has an interest in
land. If it were said he had a lien, it might not be absolutely
inaccurate language, but it would be a very inaccurate application
of such language to take it as ruling that he had nothing but a
lien. But it is not more certain that a landlord has an interest
in land, than that a widow has under the Act of 1794, even after
partition.

Again, if it were a mere lien, it could not be bound by a judg-
ment, as in Thomas v. Simpson, and it would be subject to taxa-
tion, and, except as affected by the Married Woman's Act of
1848, would be liable to be reduced to possession by a second
husband; tests, all these, that are decisive against the theory that
it is a mere lien.

But in Kurtz's Appeal, 2 *Casey* 465, the widow's interest, after
partition under our present intestate laws, was held to be such a
lien as, under the Act of 1830, would cause a sheriff's sale to

[Zeigler's Appeal.]

discharge the lien of a mortgage. That case was not decided under the Act of 1794, and, therefore, is not applicable here, though I fear it is not sustainable under any of our intestate laws, past or present. When it comes to be examined in connection with the modern legislation, will be the time to declare definitely whether it was a mistake or not. Meantime the authorities on which it was ruled, and others which I have cited above, do not warrant me in following it in a case arising, as this does, under the Act of 1794.

As to the six acres and twenty-four perches, that were never subject to the widow's dower, there is no ground for a doubt; but as I hold the mortgage of Zeigler divested as to none of the land embraced in it, I am under no necessity to examine any other question upon the record.